James S. Angell (CO Bar # 31880)
McCrystie Adams (CO Bar # 34121)
Earthjustice
1400 Glenarm Place, Suite 300
Denver, CO 80202
jangell@earthjustice.org
madams@earthjustice.org
Telephone: (303) 623-9466
Fax: (303) 623-8083

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

_____

|  |  |
|---|---|
| THE WILDERNESS SOCIETY, ARIZONA WILDERNESS COALITION, SIERRA CLUB, GRAND CANYON WILDLANDS COUNCIL, and NATIONAL TRUST FOR HISTORIC PRESERVATION, | ) ) ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) ) |
| U.S. BUREAU OF LAND MANAGEMENT; RON WENKER, in his official capacity as Acting Director of U.S. Bureau of Land Management; JAMES KENNA, in his official capacity as BLM Arizona State Director; TOM EDGERTON, in his official capacity as Grand Canyon-Parashant National Monument Manager; LINDA PRICE, in her official capacity as Vermilion Cliffs National Monument Manager; and LORRAINE M. CHRISTIAN, in her official capacity as Arizona Strip Field Manager, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

_____

Civil No. 09-cv-8010-PCT-PGR

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

# INTRODUCTION[1]

1.      Pursuant to the Antiquities Act of 1906, President Clinton created the Grand Canyon-Parashant and Vermilion Cliffs National Monuments nine years ago to protect their spectacular landscapes, unparalleled geological formations, artifacts from more than 10,000 years of human history, wildlife, and the solitude and remoteness essential to the character of these lands.  The Presidential Proclamations creating the Monuments in 2000 ordered the U.S. Bureau of Land Management (BLM) to protect these resources and values, called "objects of interest," in managing the Monuments.  To do so, the Presidential Proclamations specifically prohibited the use of motorized vehicles off of any roads.

2.      Instead of extending the National Monuments the especially protective management to which they are legally entitled, BLM adopted resource management plans (RMPs) that treat the Monuments as if they are indistinguishable from general multiple-use BLM lands.  This is perhaps most evident in BLM's designation of a spider web of thousands of miles of trails and routes for motorized vehicles that BLM admits will damage the objects listed in the Proclamations.  In doing so, BLM ignored the inevitable impacts to the Monuments' cultural resources, wildlife and their habitat, and the wilderness character of these lands, all of which were to be protected under the Monument Proclamations.  Because BLM's RMPs allow motor vehicles on tracks, ruts, and trails that would fail any reasonable definition of a "road," the RMPs also ignored the Monument Proclamations' explicit prohibition on the use of motorized vehicles off road.

---

[1]      Pursuant to Fed. R. Civ. P. 15(a), Plaintiffs are permitted to amend their complaint "once as a matter of course at any time before a responsive pleading is served."  Federal Defendants have not yet filed an answer to Plaintiffs' Complaint.

3.      In addition to failing to comply with the Monument Proclamations, BLM also relied on a settlement agreement between the Department of the Interior and State of Utah to unlawfully disavow its statutory authority to fully consider the protection of wilderness-quality lands in the Monuments.  As a result, the solitude, remoteness, and wildlife habitat so important to these lands may be degraded or destroyed by motor vehicle use and other activities permitted by BLM.

4.      BLM's resource management plans for the Grand Canyon-Parashant and Vermilion Cliffs National Monuments and the underlying Final Environmental Impact Statement violate several federal environmental laws and are arbitrary and capricious under the Administrative Procedure Act (APA).

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 5 U.S.C. §§ 701–706 (Administrative Procedure Act).

6.      Venue is proper in the District of Arizona pursuant to 28 U.S.C. § 1391(e) because the events or omissions giving rise to the claims occurred within this judicial district, the public lands and resources in question are located in this district, the majority of the environmental impacts resulting from this project will impact this district, and because Defendants have offices in this district.

## PARTIES

7.      Plaintiff The Wilderness Society (TWS) is a non-profit environmental organization founded in 1935.  The Wilderness Society now has over 300,000 members and supporters nationwide, including 5,500 in Arizona.  The mission of TWS is to protect

wilderness and inspire Americans to protect our wild places.  TWS works to deliver to future generations an unspoiled legacy of wild places, with all the values they hold: biological diversity, clean air and water, towering forests, rushing rivers, and sage-sweet, silent deserts.  TWS has worked for years to protect BLM wilderness-quality lands and other sensitive lands in Arizona, including through designation of national monuments, and views protecting Arizona's National Monuments as vital to achieving its mission.

8.      Plaintiff Arizona Wilderness Coalition (AWC) is an environmental coalition formed in the 1970s with almost 1,500 members throughout Arizona.  AWC works to permanently protect and restore wilderness and other wild lands and waters in Arizona for the enjoyment of all citizens and to ensure that Arizona's native plants and animals have a lasting home in wild nature.  AWC has been actively involved in the Monuments' planning process.  AWC submitted a detailed wilderness proposal to BLM during the planning process identifying areas with wilderness characteristics in the Arizona Strip planning area, including the Grand Canyon-Parashant and Vermilion Cliffs Monuments.

9.      Plaintiff Sierra Club is a non-profit corporation with its principal place of business in San Francisco, California.  The Sierra Club is a national conservation organization with a membership of approximately 560,000, including more than 13,000 members in Arizona.  The Sierra Club's purposes include protecting and enhancing the natural resources and human environment of the United States and the earth, and exploring, enjoying, and preserving those resources.  As part of that mission, the Sierra Club advocates for responsible management of National Monuments and other public land resources in Arizona.

10.     Plaintiff Grand Canyon Wildlands Council (GCWC) works to design and implement a wildlands network that protects and restores natural patterns of distribution and abundance of all native species in the Grand Canyon ecoregion.  GCWC represents 330 members in Arizona.  GCWC has been actively involved in the Grand Canyon-Parashant and Vermilion Cliffs Monuments' planning process since its inception, working to protect and restore the unparalleled biological resources and landscapes of these Monuments.

11.     Plaintiff National Trust for Historic Preservation (National Trust) is a non-profit organization chartered by Congress in 1949 "to facilitate public participation in the preservation of sites, buildings, and objects of national significance or interest" and to further the purposes of federal historic preservation laws.  16 U.S.C. §§ 461, 468.  With the support of more than 266,000 individual members nationwide, including more than 3,200 members in Arizona, the National Trust advocates to preserve and protect historic properties, including those situated on public lands.  The National Trust plays a unique role as an advocate in the historic preservation field because as a private organization it can respond to enforcement problems from a national perspective.  The National Trust has been actively involved in the Monuments' planning process.

12.     Plaintiffs' members use and enjoy public lands within the planning area for a variety of purposes, including scientific study, recreation, wildlife viewing, and aesthetic appreciation.  These members frequently visit and recreate (e.g., camping, hiking, bird-watching, sightseeing, enjoying solitude, viewing cultural resources, and engaging in scientific study) throughout the public lands governed by the Grand Canyon-Parashant and

Vermilion Cliff National Monuments' resource management plans. Plaintiffs' members will continue to do so in the future.

13. Plaintiffs' and their members' interests will be directly affected and irreparably harmed by decisions made in the Monuments' resource management plans. The designated travel network, livestock grazing authorizations, and other decisions made in the plans will destroy and degrade "objects of interest" mandated for protection in the Grand Canyon-Parashant and Vermilion Cliffs National Monument Proclamations, including irreplaceable cultural resources, geological and paleontological resources, and the solitude and natural splendor of the Monuments. The plans will also significantly affect the wilderness quality and other resources of the public lands at stake in this suit, and will harm wildlife and wildlife habitat, including critical riparian areas, which also are designated as Monument "objects." The environmental and cultural degradation will adversely impact Plaintiffs members' recreational, cultural, and scientific interests in these lands. Plaintiffs and their members are also harmed by BLM's failure to adequately address these impacts through proper National Environmental Policy Act (NEPA) and National Historic Preservation Act (NHPA) analyses. Plaintiffs and their members have a substantial interest in seeing that BLM complies with these laws and in participating in the legally-required public processes.

14. Defendant BLM is the agency charged with administering the Vermilion Cliffs National Monument and the portion of the Grand Canyon-Parashant National Monument that is outside of Lake Mead National Recreation Area. BLM is responsible for complying with the Monument Proclamations and all applicable environmental laws,

including NEPA, the Federal Land Policy and Management Act (FLPMA), and the NHPA, in its management of these monuments.

15.     Defendant Ron Wenker is sued in his official capacity as Acting Director of the U.S. Bureau of Land Management.  Mr. Wenker is responsible for ensuring that lands administered by BLM are managed in accordance with all applicable laws and regulations.

16.     Defendant James Kenna is sued in his official capacity as the Arizona State Director of BLM.  Mr. Kenna is responsible for ensuring that BLM lands in Arizona are managed in accordance with all applicable laws and regulations.

17.     Defendant Tom Edgerton is sued in his official capacity as the Manager for Grand Canyon-Parashant National Monument.  Mr. Edgerton is responsible for ensuring that the Grand Canyon-Parashant National Monument lands are managed in accordance with all applicable laws and regulations.

18.     Defendant Linda Price is sued in her official capacity as the Manager for Vermilion Cliffs National Monument.  Ms. Price is responsible for ensuring that the Vermilion Cliffs National Monument lands are managed in accordance with all applicable laws and regulations.

19.     Defendant Lorraine M. Christian is sued in her official capacity as the Arizona Strip Field Manager.  Ms. Christian is responsible for ensuring that the Arizona Strip Field Office lands, including the Grand Canyon-Parashant and Vermilion Cliffs National Monuments, are managed in accordance with all applicable laws and regulations.

**STATUTORY BACKGROUND**

**I.      The Antiquities Act and Presidential Proclamations 7265 and 7374**

20.      Under the Antiquities Act of 1906, the President may set aside specific federal lands for protection as national monuments:

> The President of the United States is authorized, in his discretion, to declare by public proclamation historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest that are situated upon the lands owned or controlled by the Government of the United States to be national monuments, and may reserve as a part thereof parcels of land, the limits of which in all cases shall be confined to the smallest area compatible with the proper care and management of the objects to be protected.

16 U.S.C. § 431.

21.      On January 11, 2000, pursuant to his authority under the Antiquities Act, President Clinton issued Presidential Proclamation 7265 creating the Grand Canyon-Parashant National Monument.  65 Fed. Reg. 2825 (January 18, 2000).  The Proclamation assigned management authority over the portion of the Monument within the Lake Mead National Recreation Area to the National Park Service and management authority over the remaining portion of the Grand Canyon-Parashant National Monument to BLM.  *Id*. at 2828.

22.      On November 9, 2000, pursuant to his authority under the Antiquities Act, President Clinton issued Presidential Proclamation 7374 creating the Vermilion Cliffs National Monument.  65 Fed. Reg. 69227 (November 15, 2000).  The Proclamation assigned BLM management authority over the Vermilion Cliffs National Monument. *Id*. at 69229.

23.      The Proclamations declared that the Monuments "shall be the dominant reservation" of those lands.  65 Fed. Reg. at 2828; *id.* at 69229.

24.     The Monuments were created "for the purpose of protecting the objects identified" in the Proclamations.  *Id.* at 2827; *id.* at 69228.  These objects include an array of scientific, biological, geological, hydrological, cultural, and historical resources.  *Id.* at 2825-27; *id.* at 69227-28.

25.     The Proclamations ordered BLM to manage the Monuments "pursuant to applicable legal authorities, to implement the purposes" of the Proclamations.  *Id.* at 2828; *id.* at 69229.

26.     To protect the objects identified in the Proclamations, both Proclamations prohibited all motorized and mechanized vehicle use off road, except for emergency or authorized administrative purposes.  *Id.* at 2827; *id.* at 69228.

27.     In addition, the Vermilion Cliffs Proclamation ordered BLM to "prepare a transportation plan that addresses the actions, including road closures or travel restrictions, necessary to protect the objects identified in this proclamation."  *Id.* at 69299.

28.     Presidential Proclamations issued pursuant to a delegation of authority from Congress, as here, have the force and effect of law.

## II.     The National Environmental Policy Act (NEPA)

29.     Congress enacted NEPA to "promote efforts which will prevent or eliminate damage to the environment."  42 U.S.C. § 4321.  To achieve this goal, NEPA requires federal agencies to fully consider and publicly disclose the environmental consequences of an agency action before proceeding with that action.  *Id.* § 4332(2)(C); 40 C.F.R. §§ 1501.2, 1502.5.  In addition, federal agencies must notify the public of proposed projects and allow the public to comment on the fully-disclosed environmental impacts of those actions.  40 C.F.R. § 1506.6.

30.     The cornerstone of NEPA is the environmental impact statement (EIS).  An EIS is required for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4.  It provides a "full and fair discussion of significant environmental impacts and . . . inform[s] the decisionmakers and the public of reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1.

31.     In the EIS, the federal agency must identify direct, indirect, and cumulative impacts of the proposed action, consider alternative actions and their impacts, and identify all irreversible and irretrievable commitments of resources associated with the action.  42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1508.7, 1508.8, 1502.14.  Direct effects are those "which are caused by the action and occur at the same time and place." 40 C.F.R § 1508.8(a).  Indirect effects are "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* § 1508.8(b).  Cumulative impacts are impacts from "past, present and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." *Id.* § 1508.7.  "Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *Id.*

32.     NEPA also requires agencies to disclose and analyze measures to mitigate the impacts of proposed actions.  40 C.F.R. §§ 1502.14(f), 1502.16(h).  An agency's analysis of mitigation measures must be reasonably complete in order to properly evaluate the severity of the adverse effects of a proposed project prior to making a final decision.

33.     NEPA requires agencies to consider "alternatives to the proposed action." 42 U.S.C. § 4332(C)(iii) & (E).  The discussion of alternatives is the "heart" of the NEPA

9

process and is intended to provide "a clear basis for choice among options by the decisionmaker and the public."  40 C.F.R. § 1502.14.

**III.    The Federal Land Policy and Management Act (FLPMA)**

34.    Prior to FLPMA's passage in 1976, BLM lands were governed by a mélange of some 3,000 outdated and often-conflicting public lands laws.  FLPMA cleared away many of these outmoded laws and, for the first time, provided BLM with a "comprehensive, statutory statement of purposes, goals, and authority for the use and management" of BLM lands.  S. Rep. No. 94-583, at 24 (1975).

35.    FLPMA requires that BLM comply with all applicable laws and authorities, including the Monument Proclamations, the National Environmental Policy Act, and the National Historic Preservation Act in land use planning and when authorizing activities under those plans.  43 U.S.C. § 1712(c)(8); 43 C.F.R. § 2920.7(b)(3).

36.    FLPMA § 202 requires that BLM develop and maintain land use plans for each BLM area.  43 U.S.C. § 1712(a).  BLM's land use plans provide an orderly, public process for balancing competing demands such as commercial exploitation, recreation, and environmental protection.  43 U.S.C. § 1712.  FLPMA does not dictate how land use plans must strike this balance.  Instead, Congress directed the agency to manage its lands under the principles of "multiple use and sustained yield."  43 U.S.C. § 1732(a); 43 U.S.C. § 1712(c)(1).  "Multiple use" is defined broadly as:

> [T]he management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people; ... the use of some lands for less than all of the resources; a combination of balanced and diverse resource uses that takes into account the long term needs of future generations for renewable and non-renewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific

and historical values; and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the lands and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output.

43 U.S.C. § 1702(c).

37.     FLPMA further requires that the BLM "manage the public lands under principles of multiple use and sustained yield, in accordance with the land use plans . . ., *except that where a tract of such public land has been dedicated to specific uses according to any other provisions of law it shall be managed in accordance with such law.*" 43 U.S.C. § 1732(a) (emphasis added).

38.     While § 202 applies to planning on all BLM lands, FLPMA § 603, 43 U.S.C. § 1782, applies only to BLM's review and management of lands eligible for protection under the Wilderness Act.  Subsection (a) sets a fifteen-year deadline for determining – on the basis of an inventory carried out under § 201 – which BLM lands are eligible for wilderness designation.  43 U.S.C. § 1782(a).  In addition to setting the deadline for BLM's initial § 201 wilderness inventory, § 603(a) requires BLM to issue a formal recommendation to the President concerning the suitability of these areas for wilderness protection.  Section 603(b) requires that, within two years, the President tell Congress which lands he believes should be designated as wilderness.  43 U.S.C. § 1782(b).

39.     To safeguard Congress's prerogative to designate the wilderness-eligible lands (known as "Wilderness Study Areas" or "WSAs") as wilderness, § 603(c) requires BLM to manage WSAs so that their wilderness suitability is not "impaired."  43 U.S.C.

§ 1782(c).  Shortly after FLPMA's passage, BLM adopted an Interim Management Policy for Lands Under Wilderness Review (IMP), which details how the agency would manage WSAs to satisfy § 603(c)'s "nonimpairment mandate."

40.     Section 603 applies only to "roadless areas of five thousand acres or more and roadless islands."  43 U.S.C. § 1782(a).  However, BLM has also relied on its general land use planning authority under § 202 of FLPMA to create scores of "WSAs" of less than five thousand acres.  Thus, BLM lands include both "§ 603 WSAs" and "§ 202 WSAs." Management for both WSA types is described in the IMP.  Under the IMP, § 202 and § 603 WSAs are managed in nearly, though not exactly, identical fashion.

41.     BLM must prepare an EIS during the RMP planning process: "[a]pproval of a resource management plan is considered a major Federal action significantly affecting the quality of the human environment.  The environmental analysis of alternatives and the proposed plan shall be accomplished as part of the [RMP] planning process and, wherever possible, the proposed plan and related [EIS] shall be published in a single document."  43 C.F.R. § 1601.0-6.

42.     BLM's land management authority is also governed by its 1979 regulations on off-road vehicles (ORVs), 43 C.F.R. §§ 8340-42, which incorporate the requirements set out in Executive Order No. 11644, 37 Fed. Reg. 2877 (February 8, 1972), as amended by Executive Order. No. 11989, 42 Fed.Reg 26959 (May 24, 1977).  These regulations require that BLM locate ORV routes so as "to minimize damage to soil, watershed, vegetation, air, or other resources of the public lands and to prevent impairment of wilderness suitability," 43 C.F.R. §  8342.1(a), "to minimize harassment of wildlife or significant disruption of wildlife habitats," 43 C.F.R. § 8342.1(b), "to minimize conflicts

between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands, and to ensure compatibility of such uses with existing conditions in populated areas, taking into account noise and other factors," 43 C.F.R. § 8342.1(c), and prohibit trails in "officially designated wilderness areas or primitive areas," 43 C.F.R. § 8342.1(d).  The regulations also require BLM to close areas to ORVs where ORVs are causing or will cause negative impacts to soil, vegetation, wildlife, wildlife habitat, cultural resources, wilderness suitability, or threatened and endangered species.  43 C.F.R. § 8341.2(a).  An area closed to ORVs under this provision can only be reopened to such vehicles if BLM "determines that the adverse effects have been eliminated and measures implemented to prevent recurrence."  *Id.*

## IV.    The National Historic Preservation Act (NHPA)

43.    Congress enacted the NHPA in 1966 to implement a broad national policy encouraging the preservation of the country's historic and cultural resources.  16 U.S.C. § 470(b), 470-1.

44.    The heart of the NHPA is § 106, which prohibits federal agencies from approving any federal "undertaking" including the issuance of any license, permit, or approval, without first considering the effects of the action on historic properties or cultural artifacts that are eligible for inclusion or are listed in the National Register of Historic Places.  16 U.S.C. §§ 470f, 470w(7).

45.    The Advisory Council on Historic Preservation (ACHP) has promulgated regulations implementing § 106 that are binding on all other federal agencies.  36 C.F.R. Part 800.

46.     The goal of § 106 is to "identify historic properties potentially affected by the undertaking, assess its effects and seek ways to avoid, minimize or mitigate any adverse effects," in consultation with the State Historic Preservation Officer (SHPO), Native American tribes, and other parties with a demonstrated interest in the undertaking. *Id.* §§ 800.1(a), 800.2(a)(4).

47.     Federal agencies must also "seek and consider the views of the public" during the § 106 process and develop a plan for public involvement.  *Id.* §§ 800.2(d), 800.3(e).

48.     Prior to approving an undertaking, an agency must: (1) identify the area of potential effects; (2) review existing information on historic properties within this area (including possible historic properties not yet identified); (3) seek information about historic properties from relevant parties; (4) evaluate the undertaking's potential effects on historic properties; and (5) develop and evaluate alternatives or modifications to the undertaking that could avoid, minimize, or mitigate adverse effects.  *Id.* §§ 800.3-800.7.

49.     An agency must document the measures to resolve an undertaking's adverse effects in either a Memorandum of Agreement or Programmatic Agreement.  *Id.* §§ 800.6(c), 800.14(b).  Alternatively, an agency may resolve adverse effects through an EIS Record of Decision, with prior notification to the SHPO and ACHP.  *Id.* § 800.8(c), (c)(4).

## STATEMENT OF FACTS

**I.      Grand Canyon-Parashant National Monument**

50.     On January 11, 2000, through Proclamation 7265, President Clinton created the Grand Canyon-Parashant National Monument.  The Monument encompasses 1,014,000

acres north of Arizona's Grand Canyon.  The BLM-managed area of the Monument includes 808,747 acres.

51.     The Grand Canyon-Parashant Monument includes the lower portion of the Shivwits Plateau and is bounded on the west by the Grand Wash Cliffs and on the east by the Hurricane Cliffs.

52.     The Grand Canyon-Parashant Monument was created "for the purpose of protecting the objects identified" in the Proclamation.  65 Fed. Reg. at 2827.  The Proclamation identified "an array of scientific and historic objects."  *Id.* at 2825.

53.     The Proclamation describes spectacular scenery and landscapes as objects worthy of protection.  "This remote area of open, undeveloped spaces and engaging scenery is located on the edge of one of the most beautiful places on earth, the Grand Canyon. . . . Full of natural splendor and a sense of solitude, this area remains remote and unspoiled, qualities that are essential to the protection of the scientific and historic resources it contains."  *Id.*

54.     The Monument's objects include a "rich geologic history spanning almost 2 billion years."  *Id.*  As the Proclamation explains, "The Monument is a geological treasure. . . . Deep canyons, mountains, and lonely buttes testify to the power of geological forces and provide colorful vistas."  *Id.*

55.     The Proclamation identifies "abundant" fossils within the Monument as objects to be protected.  *Id.* at 2826.

56.     Monument objects to be protected also include archaeological evidence of human use spanning more than 11,000 years.  *Id.* at 2825-26.  Prehistoric use of the area is documented by "irreplaceable rock art images, quarries, villages, watchtowers, agricultural

features, burial sites, caves, rockshelters, trails, and camps." *Id.* at 2826. Archaeological sites include "large concentrations of ancestral Puebloan (Anasazi or Hitsatsinom) villages, a large, intact Pueblo II village, numerous archaic period archeological sites, ancestral Puebloan sites, and Southern Paiute sites," as well as "areas of importance to existing Indian tribes." *Id.* In addition, according to the Proclamation, the Monument's "remote and undeveloped nature" protects historical sites documenting the passage of Spanish and American explorers, settlers, and miners. *Id.*

57.     The Monument's objects include "outstanding biological resources preserved by remoteness and limited travel corridors." *Id.* These include the Giant Mojave Yucca cacti, a trophy-quality mule deer herd, Kaibab squirrels, and wild turkey. *Id.* at 2827. These objects also include species protected by the Endangered Species Act, such as the Mexican spotted owl, California condor, desert tortoise, and southwestern willow flycatcher, and sensitive species such as the spotted bat, western mastiff bat, the Townsend's big eared bat, goshawk, and two rare plant species. *Id.*

58.     The Monument's biological resources also encompass the diversity resulting from the junction of the extreme ecosystems of the Mojave Desert and the Colorado Plateau. *Id.* at 2826. These ecosystems range "from stark, arid desert to complex, dramatic higher elevation plateaus, tributaries, and rims of the Grand Canyon." *Id.* The intersection of the Sonoran/Mojave/Great Basin ecosystems and the Colorado Plateau is a "distinctive and remarkable feature." *Id.* at 2826-7.

59.     Important riparian areas link the Colorado Plateau to the Colorado River corridor, allowing wildlife movement and plant dispersal. *Id.* at 2827. The south end of the Shivwits Plateau contains several important tributaries to the Colorado River, including

1   the "rugged and beautiful Parashant, Andrus, and Whitmore canyons," according to the

2   Proclamation.  *Id.* at 2825.

3   **II.     Vermilion Cliffs National Monument**

4

5       60.     On November 9, 2000, through Presidential Proclamation 7374, President

6   Clinton created the Vermilion Cliffs National Monument. 65 Fed. Reg. 69227.   The

7   Monument encompasses approximately 293,000 acres on and around northern Arizona's

8   Paria Plateau.

9

10      61.     The Proclamation created the Monument "for the purpose of protecting the

11  objects" identified in the Presidential Proclamation.  *Id.* at 69228.

12      62.     According to the Proclamation, the Monument contains "outstanding objects

13  of scientific and historic interest."  *Id.* at 69227.  In addition, as the Proclamation explains,

14  the Monument is "[f]ull of natural splendor and a sense of solitude."  *Id.*  The Monument's

15  remote and unspoiled qualities "are essential to the protection of the scientific and historic

16

17  objects it contains."  *Id.*

18      63.     For example, like the Grand Canyon-Parashant National Monument, the

19  Vermilion Cliffs National Monument is described in the Proclamation as a "geological

20  treasure."  *Id.*  The Vermilion Cliffs lie along the southern edge of the Paria Plateau, the

21  "centerpiece" of the Monument, and "rise 3,000 feet in a spectacular escarpment."  *Id.*

22

23      64.     The Monument's objects also include Coyote Buttes, "a geologically

24  spectacular area where crossbeds of the Navajo Sandstone exhibit colorful banding in

25

26  surreal hues of yellow, orange, pink, and red caused by the precipitation of manganese,

27  iron, and other oxides."  *Id.*

28

65.     The geological objects include sandstone slick rock, rolling plateaus, and brilliant cliffs with arches, amphitheaters, and massive walls. *Id.*

66.     The Monument's objects also include evidence of a human history extending back 12,000 years or more. *Id.* These objects include some of the earliest rock art in the Southwest, high densities of Ancestral Puebloan sites and evidence of Spanish, Mexican, and Mormon expeditions as well as historic homesteads and John Wesley Powell's exploration expedition of 1871. *Id.*

67.     The Monument contains outstanding biological objects. *Id.* at 69228. These objects include an array of wildlife species, including at least 20 species of raptors, desert bighorn sheep, pronghorn antelope, mountain lion, other mammals, a variety of reptiles and amphibians, and sensitive native fish in the Paria River. *Id.*

68.     The highly endangered California condor, specifically named as an object in the Proclamation, was first released on top of the Vermilion Cliffs in 1996. FEIS at 3-73. Ongoing releases continue in the Monument. *Id.* Approximately 50 condors survive in the Monument today. *Id.*

69.     The Monument also supports a "unique combination of cold desert flora and warm desert grassland," including one threatened plant, the Welsh's milkweed, which colonizes and stabilizes shifting sand dunes. *Id.*

70.     The Monument's objects also include the Paria River and widely scattered ephemeral water sources and springs. *Id.*

**III.     BLM's Arizona Strip Planning Process**

71.     In April 2002, in accordance with Proclamations 7265 and 7374 and other legal authorities, BLM and the National Park Service announced their intent to develop

new RMPs for the Grand Canyon-Parashant National Monument and Vermilion Cliffs National Monument.  BLM committed to designating transportation networks and comprehensive travel management plans as part of both Monument RMPs.  BLM also announced its intent to revise the existing management plan for land within the Arizona Strip Field Office not included in the National Monuments; the three plans were prepared together (and collectively referred to herein as the Arizona Strip RMP).

72.     In November 2005, BLM issued a Draft Environmental Impact Statement (EIS) and a proposed RMP for the Arizona Strip, which included proposed transportation networks and travel management plans for both Monuments.

73.     Plaintiffs participated extensively in this process and provided timely, detailed scoping comments, an Alternative Transportation Network Analysis (proposing a road network that would be more consistent with the Proclamations and conservation in a general), a Citizen's Conservation Alternative (proposing an overall management approach that would comply with the Proclamations and provide a more protective management approach for all the Arizona Strip lands), and comments on the Draft EIS/Draft RMP.

74.     BLM issued a Final EIS and Proposed RMP for the Arizona Strip on March 2, 2007.  The Final RMP included a designated transportation network and travel management plan.

75.     Plaintiffs timely filed formal protests regarding the Arizona Strip Final EIS and Proposed RMP with the BLM Director.

76.     BLM denied or otherwise rejected the majority of Plaintiffs' protests of the Arizona Strip FEIS and Proposed RMP.

77.     On January 29, 2008, former Arizona State Director Elaine Zielinksi signed the Record of Decision (ROD) approving a Final RMP for the Grand Canyon-Parashant National Monument.

78.     On January 29, 2008, former Arizona State Director Elaine Zielinksi signed the ROD approving a Final RMP for the Vermilion Cliffs National Monument.

79.     The RODs approved Final RMPs that were substantially identical to the Proposed RMP in the Final EIS.

80.     The RODs constitute final agency action for the Final resource management plans for the Grand Canyon-Parashant and Vermilion Cliffs National Monuments.

## IV.     Arizona Strip Final EIS and Monument RMPs

### A.     Management of Monument Objects

81.     BLM acknowledged in the Final EIS that it is required to "protect objects in the Monuments and thus avoid any adverse impacts that would otherwise 'impair' such objects." FEIS at ES-6. As BLM explained, the Proclamations "subject [the Monuments] to the overriding purpose of protecting the Monument objects as described in the Proclamations." *Id.* at 1-1.

82.     The Draft and Final Arizona Strip EIS analyzed five alternatives, including the "No Action" and "Preferred" alternatives.

83.     None of the five alternatives provide for the protection of Monument objects as the overriding purpose of the RMPs.

84.     BLM admitted in the Final EIS that the final RMPs will have adverse effects on several Monument objects.

85.     For example, BLM recognized that roads and motor vehicle use impact the Monuments' geological and paleontological objects by causing erosion, destruction of resources by motorists driving off roads, excavation, theft, and vandalism. *Id.* at 4-49.  As the FEIS acknowledges, "damage, theft, and vandalism are usually concentrated near roads and trails.  Impacts to geological and paleontological resources may increase because of additional visitation to the Planning Area." *Id.*  BLM admitted that direct and indirect impacts from the Monuments' designated transportation network and travel management plans would in some locations "change one or more character-defining features of a geological and paleontological resource," and the disturbance "could involve a unique or rare resource." *Id.* at 4-50, 4-57, 4-58.

86.     BLM also expected motorized use and the RMPs' route designations to be a primary source of damage to cultural sites. *Id.* at 4-172 (impacts from Alternative A), 4-186 (proposed Alternative E impacts same as those under Alternative A).  Such harm is most common within several hundred yards of roads. *Id.*  The routes open for motorized use will allow for access by visitors who intentionally or unintentionally damage sites. *Id.*  Such impacts are expected to be "measurable and perceptible," and "would be readily apparent." *Id.* at 4-172 to 4-173, 4-186, 4-170.  Moreover, some impacts "would change one or more character-defining features of an archaeological or historic resource." *Id.*

87.     BLM also recognized that wildlife and wildlife habitat, named as Monument objects, will be harmed by the designated transportation network and travel management plans. *Id.* at 4-101 (impacts from Alternative A), 4-124 (impacts from Alternative E similar to Alternative A).  Motorized use and the recreational activities facilitated by motorized use may cause injuries and death to wildlife, fragment habitat, provide access

corridors for weed invasion, hunting, pollution, wildfires, and habitat-altering projects, and cause a variety of other disturbances that change wildlife movement and habitat use. *Id.* at 4-101, 4-124, 4-132, 4-165. BLM acknowledged that even minor changes to vegetation can affect fish and wildlife populations. *Id.* at 4-99. According to the FEIS, some areas have been "rendered unusable to species with narrow tolerances by long-term recreational use." *Id.* at 4-128.

88.     Similarly, BLM acknowledged that livestock grazing may have adverse impacts to wildlife species and their habitat, riparian areas, and water quality, all named as Monument objects. *See id.* at 4-149 to 4-153, 4-166; 4-21 to 4-22, 4-31.

89.     The impacts caused by route designations and grazing are especially critical for the desert tortoise, a federally-protected endangered species, and a named object in the Grand Canyon-Parashant Proclamation. For example, desert tortoises "could be disturbed, injured, or killed as a result of the operation of motorized vehicles within their habitat," including "mortality and crushing of burrows . . . as a result of vehicles pulling off the road for camping, horseback riding, mountain biking, or other recreational pursuits." *Id.* at 4-154, 4-167.

90.     As a result of these and other impacts caused by the designated transportation network, approved livestock grazing, and other activities authorized by the Final EIS and Monument RMPs, these plans fail to protect and, instead, adversely affect Monument objects.

**B.     The Monuments' Designated Routes and Travel Management Plans**

**1.     Route Evaluation Tree**

91.     The approved Grand Canyon-Parashant and Vermilion Cliffs RMPs designate a transportation network and include travel management plans.

92.     In the Grand Canyon-Parashant National Monument, BLM designated 1,270 miles of routes "open" for motorized vehicle travel, 176 miles of routes as available for administrative motorized uses and non-motorized public uses, and 28 miles of routes open to all users for non-motorized uses only.  *See* Grand Canyon-Parashant RMP at 2-94.  BLM designated 174 miles of routes as "closed" to all motorized uses.  *Id*. at 2-94 to 2-95.

93.     In the Vermilion Cliffs National Monument, BLM designated 374 miles of routes "open" for motorized vehicle travel, 74 miles of routes as available for administrative motorized uses and non-motorized public uses, and six miles of routes open to all users for non-motorized uses only.  Vermilion Cliffs RMP at 2-76.  BLM designated 116 miles of  routes as "closed" to all motorized uses.  *Id.*

94.     BLM used and relied on the "Route Evaluation Tree" to designate the route networks for the Monuments.  *See* FEIS at 4-308.

95.     The Route Evaluation Tree is a flow chart containing various criteria to evaluate specific routes for inclusion in the Monuments' road networks.  *Id*. at App. 2.T.

96.     The Route Evaluation Tree does not prioritize the protection of the objects identified in the Monument Proclamations.

97.     The Route Evaluation Tree also fails to prioritize the factors in FLPMA's ORV regulations and the ORV executive orders that require BLM to minimize impacts to public lands resources.  *Id*. at App. 2.T-25 to 2.T-32.

98.     The Route Evaluation Tree assumes mitigation will occur to alleviate adverse impacts, but does not detail the specific actions to be taken.  *Id.* at App. 2.T-29 to 2.T-30.

99.     Even if mitigation measures would be effective in protecting resources, the Route Evaluation Tree assumes that BLM would have the financial resources to monitor the impacts and to identify the need for mitigation on specific routes.  BLM has not previously had, and does not currently have, the funding to adequately monitor the vast transportation network the Monument RMPs approved.

100.     As a result of this flawed process, BLM failed to close routes that are unnecessarily damaging to scarce cultural resources, riparian areas, native plants and wildlife species, and other public resources, including objects to protected in the Proclamations.

### 2.     Monument RMPs Allow Motorized Vehicles Off "Roads"

101.     The Proclamations for the Grand Canyon-Parashant and the Vermilion Cliffs Monuments prohibit motorized and mechanized vehicle use off road, except for emergency or authorized administrative purposes.

102.     In response, BLM created a network allowing motorized vehicles to drive on all designated "routes," which include tracks, ruts, and trails that do not meet any standard definition of a "road."

103.     BLM's current guidance defines a "road" as a "linear route" that is "used primarily by vehicles having four or more wheels, documented as such by the owner, and maintained for regular and continuous use."  Instruction Memo. (IM) No. AZ-2005-07, IM 2006-173.

104.    Under this definition – or any other reasonable definition – tracks created by repeated passage of vehicles, people, or wildlife do not constitute a road.  Mechanical improvement, whether by hand tools or power machinery, is necessary to establish a road.

105.    A "route" available for motorized use is defined in the Final EIS as "any motorized, non-motorized, or mechanized transportation corridor," which include "roads," "primitive roads," and "trails."  FEIS Glossary at 27.

106.    As those terms are defined in the EIS, "primitive roads" and "trails" do not constitute a "road" for the purposes of the National Monument proclamations.

107.    A "primitive road" is defined by the FEIS as a "linear route used by four wheel drive or high clearance vehicles.  "Primitive roads" do not normally meet any BLM road design standards."  *Id.* at 23.  A "trail" is defined as a "linear route managed for human powered, stock, or off-highway vehicle forms of transportation or for historical or heritage values.  Trails are not generally managed for use by four wheel drive or high clearance vehicles.  Examples would be hiking, equestrian, mountain biking, motorcycle 'trails.'"  *Id.* at 33.

108.    By allowing vehicle use on "primitive roads" and "trails," the Monuments' transportation network, as set forth in the Final EIS, explicitly permitted use of motorized and mechanized vehicle use off of "roads."

109.    In response to Plaintiffs' Protests, BLM agreed that a "trail" that allowed both motorized and non-motorized use would violate the Monument Proclamations.

110.    However, rather than bar motorized and mechanized use on what BLM had designated as "trails" in the Final EIS, it appears that BLM simply redesignated "trails" as "roads" or "primitive roads" and left them open for use.  This is reflected in the fact that

the total number of miles of routes open to use in the Final EIS and RODs is nearly identical. *See* FEIS at 2-221; Grand Canyon-Parashant RMP at 2-94; Vermilion Cliffs RMP at 2-76.

111.    Furthermore, the RODs/Final RMPs do not limit motorized and mechanized vehicle use to "roads" as the proclamations require because they permit use on a distinct category of so-called "primitive roads."

### 3.    Impacts to Fish and Wildlife Species And Habitat

112.    Roads and motorized vehicles have numerous direct, indirect, and cumulative effects on wildlife and wildlife habitat.

113.    In their comments on the Draft EIS and their Protests, Plaintiffs identified numerous examples of current scientific studies attesting to the deleterious impacts of roads and motorized vehicles to wildlife and habitat.  Plaintiffs also provided these studies in support of their Alternative Transportation Network Analysis and Conservation Alternatives.

114.    BLM ignored these scientific studies when its EIS evaluated the Plans' impacts to fish and wildlife and special status species.

115.    Plaintiffs also completed a detailed analysis of the impacts caused by existing routes on the Monuments to the desert tortoise, mountain lion, bighorn sheep, pronghorn and mule deer, all of which are named as objects in the Proclamation.  Plaintiffs specifically identified the ways in which the proposed transportation networks exceeded scientifically-acceptable road densities for these wildlife species and proposed improvements to rectify the harm to these Monument objects.

116.    BLM did not incorporate available scientific information or Plaintiffs'
analysis into its evaluation of impacts caused by its route designations.

117.    BLM did not consider the impacts of increased visitation and population
growth in its evaluation of the impacts of its travel network on wildlife or wildlife habitat.

### 4.    Impacts to Cultural Resources

118.    Roads and motorized vehicles cause numerous direct and indirect impacts to
cultural resources, including archaeological and historic resources and resources important
to American Indians.  Direct impacts can include unauthorized collection and excavation,
vandalism, trampling, off-road vehicle use, soil compaction, and mechanized surface
disturbance.  Indirect impacts can include surface disturbance that may allow subsequent
soil erosion and undermining of sites and structures.   Reducing this access can protect
certain sites.

119.    BLM admits the agency does not know the location of the vast majority of
the cultural resources on the Grand Canyon-Parashant and Vermilion Cliffs Monuments.
FEIS at 4-169.

120.    Less than 5 percent of the Arizona Strip, including the Monuments and the
Arizona Strip Field Office lands, has been inventoried for archaeological and historic
resources.  *Id*. at 3-90, 4-169 to 4-170.

121.    No scientific investigations of cultural resources have occurred in Vermilion
Cliffs National Monument.  *Id*. at 3-95.

122.    The only scientific investigations of sites in Grand Canyon-Parashant
National Monument have been "limited" excavations at a small number of sites and
potsherd research at one site.  *Id.* at 3-95.

123.   Previously recorded sites indicate there are likely tens of thousands of sites in Vermilion Cliffs and Grand Canyon-Parashant Monuments.

124.   Archaeologist Peter Bungart completed an intensive cultural resources survey of 16 miles of routes within Grand Canyon-Parashant and Vermilion Cliffs Monuments in late 2004 and submitted the survey report to BLM in March 2006 along with comments and recommendations on the Draft EIS.

125.   In his survey report, Mr. Bungart identified several routes where the use of motorized or mechanized modes of travel has directly impacted historic and prehistoric archaeological sites within the Monuments.

126.   Mr. Bungart recommended in his report that BLM conduct additional inventories to create a broader baseline of data and to close routes within the Monuments found to cause adverse effects on historic and prehistoric resources.  Without more data concerning the location, significance, and condition of historic resources on the Monuments, the full extent of the impacts to cultural resources from the BLM's route designations and travel management plans is unknown.

127.   BLM did not conduct additional inventories of its own.

128.   Nonetheless, BLM concluded that the overall impacts to the Monuments' cultural resources caused by the route designations and travel management plans would be "moderate."  FEIS at 4-173, 4-186.

129.   "Moderate" impacts are defined as impacts that are "readily apparent" and "measurable and perceptible."  *Id.* at 4-170.  The impacts "would change one or more character-defining features of an archaeological or historic resource."  *Id.*

130.   BLM failed to incorporate the majority of the data from Mr. Bungart's survey report in compiling its route reports, including specific archaeological sites identified and disclosed to BLM by Mr. Bungart.

131.   The only prehistoric resources identified as objects of concern in the thousands of reports compiled by BLM during the route designation process were within the Witch Pool and Nampaweap Areas of Critical Environmental Concern.

132.   After completing the FEIS for the Grand Canyon-Parashant RMP, BLM examined existing data to determine whether historic properties would be impacted by the continued use of designated routes.

133.   BLM concluded that one "route area" – i.e., an area crossed by multiple routes – will continue to experience cultural resource impacts from use of existing routes. BLM is implementing mitigation measures to reduce those impacts.

134.   BLM did not engage in a NHPA § 106 consultation with the SHPO regarding the RMPs' designated transportation system and travel management plans.

135.   Previous to the Monuments' designation, BLM did not engage in a NHPA § 106 consultation with the SHPO regarding the impacts of the routes open to motorized vehicle use.

136.   Despite its lack of knowledge regarding 95 percent of the Arizona Strip's lands and despite its failure to conduct a § 106 consultation, BLM concluded that closing more routes to protect historic resources is "currently not needed to provide basic protection for and preservation of Monument objects," which include cultural resources.

## C.     BLM's Reliance On The Utah Wilderness Settlement

137.    In the Draft and Final EIS, BLM acknowledges that there are several hundred thousand acres of land within the Grand Canyon-Parashant and Vermilion Cliffs National Monuments that would be eligible for congressional wilderness designation.

138.    However, BLM did not consider an alternative in the Draft or Final EIS that required managing these or any other wilderness-quality lands under the IMP's non-impairment standard for § 202 WSAs.

139.    BLM justified its refusal to even consider applying the § 202 WSA non-impairment standard by pointing to a settlement agreement in *State of Utah v. U.S. Dep't of the Interior*, 535 F.3d 1184 (10th Cir. 2008), in which the agency agreed that it would not "establish, manage or otherwise treat public lands, other than Section 603 WSAs and Congressionally designated wilderness, as WSAs or as wilderness pursuant to the Section 202 process absent congressional authorization." *Id*. at 1190.

140.    Conservation groups challenged the settlement, but the Tenth Circuit dismissed the groups' facial challenge as unripe and declared that any challenge must be presented in the context of a particular agency action that relied on the settlement. *Id*. at 1192-98.   The instant lawsuit is just such an as-applied challenge to the Utah settlement.

## D.     Approval of Livestock Grazing Allotments

141.    The RMPs authorize specific livestock grazing allotments on the Grand Canyon-Parashant and Vermilion Cliffs Monuments.  Grand Canyon-Parashant RMP at 2-74 to 2-77; Map 2-10; Vermilion Cliffs RMP at 2-56 to 2-57; Map 2-7.  Approved livestock grazing in the Monuments will adversely affect the objects listed in the Monument Proclamations.

142.    Livestock grazing may have numerous impacts on Monument objects and resources, including causing damage to archaeological sites, degrading riparian areas and impairing water quality, and trampling, crushing, or otherwise destroying vegetation. Several species protected as objects in the Grand Canyon-Parashant and Vermilion Cliffs National Monuments may be adversely affected by grazing on these lands and adjacent BLM lands on the Arizona Strip.

143.    The Final EIS fails to adequately identify and analyze grazing's impacts to the Monuments' objects, including impacts to riparian areas and the wildlife corridors they provide, as well as the Grand Canyon-Parashant Monument's ponderosa pine ecosystem.

144.    Similarly, the Final EIS fails to adequately identify and analyze grazing's impacts to wildlife species protected as objects in the Proclamations, including the federally-protected desert tortoise, relict leopard frog, desert bighorn sheep, and threatened plant species.

145.    The Final EIS also fails to adequately analyze cumulative impacts resulting from grazing on adjacent BLM lands in the Arizona Strip.  Wildlife species found within the two Monuments may be affected by grazing on adjacent BLM lands.

146.    In response to Plaintiffs' protest that BLM's grazing analysis was legally inadequate, BLM responded by asserting that it would identify specific grazing issues after completing rangeland health assessments at some future date.  Protest Response at 35.

147.    Once rangeland health assessments are completed and BLM has identified specific issues, BLM claims it will make recommendations regarding how those issues and impacts should be addressed.

148.   BLM does not have sufficient funding to adequately monitor grazing or conduct adequate rangeland health assessments.

## FIRST CLAIM FOR RELIEF
(Violation of Presidential Proclamations and FLPMA)

149.   The allegations contained in paragraphs 1–148 are incorporated herein by reference.

150.   Presidential Proclamations 7265 and 7374 created the Grand Canyon-Parashant and Vermilion Cliffs National Monuments "for the purpose of protecting the objects identified" in the Proclamations.  These objects include an array of scientific, biological, geological, hydrological, cultural, and historical resources.  The Proclamations mandated that BLM manage the Monuments "pursuant to applicable legal authorities, to implement the purposes" of the Proclamations.

151.   The Proclamations declared that the Monuments "shall be the dominant reservation" of those lands.

152.   FLPMA requires that the BLM "manage the public lands under principles of multiple use and sustained yield, in accordance with the land use plans . . ., except where a tract of such public land has been dedicated to specific uses according to any other provisions of law it shall be managed in accordance with such law."  43 U.S.C. § 1732(a).

153.   The activities authorized by the Final RMPs for the Grand Canyon-Parashant and Vermilion Cliffs National Monuments will not protect and are likely to impair or adversely impact objects identified in the Proclamations.

154.    The Final RMPs for the Grand Canyon-Parashant and Vermilion Cliffs National Monuments do not prioritize protection of the objects identified in the Proclamations.

155.    By failing to adopt RMPs that prioritize or protect the objects for which the National Monuments were created, BLM's decision to adopt the Monument RMPs for the Grand Canyon-Parashant and Vermilion Cliffs National Monuments violates Presidential Proclamations 7265 and 7374 and FLPMA and was arbitrary and capricious, or otherwise not in accordance with law within the meaning of the APA.  5 U.S.C. § 706(2)(A).

## SECOND CLAIM FOR RELIEF
(Violation of Presidential Proclamations: Off-Road Vehicle Prohibition and FLPMA)

156.    The allegations contained in paragraphs 1– 148 are incorporated herein by reference.

157.    The Proclamations creating the Grand Canyon-Parashant and Vermilion Cliffs National Monuments mandated that BLM manage the Monuments "pursuant to applicable legal authorities, to implement the purposes" of the Proclamations.  To fulfill the purpose of protecting the objects identified in the Proclamations, both Proclamations prohibited all motorized and mechanized vehicle use off road, except for emergency or authorized administrative purposes.

158.    FLPMA requires that the BLM "manage the public lands under principles of multiple use and sustained yield, in accordance with the land use plans . . ., except that where a tract of such public land has been dedicated to specific uses according to any other provisions of law it shall be managed in accordance with such law."  43 U.S.C. § 1732(a).

159.    The approved designated transportation network and travel management plans for the Grand Canyon-Parashant and Vermilion Cliffs National Monuments open

routes for motorized and mechanized use that do not meet any standard or reasonable definition of "road" and undermine the purpose of the proclamations' off-road vehicle restrictions.

160.    BLM's decision to adopt the designated transportation network and travel management plans in the Monument RMPs violated the prohibitions on motorized and mechanized vehicle use off road in Proclamations 7265 and 7374 and the requirements of FLPMA and was arbitrary and capricious, or otherwise not in accordance with law within the meaning of the APA.  5 U.S.C. § 706(2)(A).

## THIRD CLAIM FOR RELIEF

(FLPMA Violation: Reliance on Invalid Settlement Agreement)

161.    The allegations contained in paragraphs 1–148 are incorporated herein by reference.

162.    FLPMA declares that BLM Resource Management Plans shall: "(1) use and observe the principles of multiple use and sustained yield . . . (4) rely, to the extent it is available, on the inventory of the public lands, their resources and other values; (5) consider present and potential uses of the public lands; (6) consider the relative scarcity of the values . . .; [and] (7) weigh long-term benefits to the public against short-term benefits. . . " 43 U.S.C. § 1712(c).  In keeping with this statutory mandate, BLM has created scores of § 202 WSAs in which the agency applies the § 202 non-impairment standard set out in the IMP.

163.    BLM refused to consider applying the IMP's § 202 WSA non-impairment standard or its functional equivalent in the National Monument RMPs or EIS because it believed that doing so would conflict with the Utah settlement in which the agency agreed

34

that it "will not establish, manage or otherwise treat public lands, other than Section 603 . . . as WSAs . . . pursuant to the Section 202 process absent congressional authorization" and that it "will refrain from applying the [Interim Management Policy or IMP] to BLM lands other than Section 603 WSAs."

164.    Because the Utah settlement misinterprets FLPMA, BLM's reliance on the Utah settlement to disavow its authority to manage its wilderness quality lands to the standards described in the IMP violates FLPMA and was arbitrary and capricious, or otherwise not in accordance with law within the meaning of the APA.  5 U.S.C. § 706(2)(A).

## FOURTH CLAIM FOR RELIEF

(FLPMA Violation: Failure to Consider or Comply With ORV Regulations and Executive Orders)

165.    The allegations contained in paragraphs 1– 148 are incorporated herein by reference.

166.    FLPMA's implementing regulations, and the overarching Executive Orders, require BLM to locate ORV trails so as to "minimize damage" to public land resources, to "minimize harassment of wildlife or significant disruption of wildlife habitats," to "minimize conflicts" with other uses, and to prohibit trails in "officially designated wilderness areas or primitive areas," among other considerations.  43 C.F.R. §§ 8342.1(a), (b), (c), (d).  These regulations also require BLM to close areas to ORVs where ORVs are causing or will cause "considerable adverse" impacts to soil, vegetation, wildlife, wildlife habitat, cultural resources, wilderness suitability, or threatened and endangered species.  43 C.F.R. § 8341.2(a).

167.   BLM adopted its designated transportation network using the Route Evaluation Tree, which failed to consider the factors required by the ORV regulations. Instead, the Route Evaluation Tree weights the designation process in favor of leaving routes open regardless of the consequences to other resources.

168.   As a result, BLM failed to close routes to ORV use that unnecessarily damage cultural resources, riparian areas, wildlife habitat, and other public resources.

169.   BLM's failure to adequately consider the ORV regulations and its decision to allow routes to remain open that unnecessarily damage cultural resources, riparian areas, wildlife habitat, and other public resources violates FLPMA and its implementing regulations and was arbitrary, capricious, or otherwise not in accordance with law within the meaning of the APA.  5 U.S.C. § 706(2)(A).

**FIFTH CLAIM FOR RELIEF**

(NEPA Violation: Failure to Consider Reasonable Range of Alternatives)

170.   The allegations contained in paragraphs 1– 148 are incorporated herein by reference.

171.   NEPA requires federal agencies, including BLM, to include within an EIS "alternatives to the proposed action."  42 U.S.C. § 4332(2)(C)(iii).  The alternatives analysis is the "heart" of a NEPA document, and the statute's implementing regulations direct BLM to "[r]igorously explore and objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.14(a).

172.   In the Utah Wilderness Settlement, BLM declares that the agency "will not establish, manage or otherwise treat public lands, other than Section 603 WSAs . . . as WSAs . . . pursuant to the Section 202 process absent congressional authorization."

173.   In keeping with this commitment, BLM refused to consider any alternative that would manage areas within the Monuments with wilderness characteristics under the protective standards set out for § 202 WSAs in the IMP or their functional equivalent.

174.   BLM also failed to consider an alternative that prioritizes or protects the objects for which the National Monuments were created.

175.   BLM's failure to consider an alternative that requires managing any areas within the Monuments with wilderness characteristics under the IMP standards for § 202 WSAs or comparable protections violated NEPA's range of alternatives requirement and was arbitrary and capricious, or otherwise not in accordance with law within the meaning of the APA.  5 U.S.C. § 706(2)(A).

176.    BLM's failure to consider an alternative that prioritizes and provides adequate protection for Monument objects violated NEPA's range of alternatives requirement and was arbitrary and capricious, or otherwise not in accordance with law within the meaning of the APA.  5 U.S.C. § 706(2)(A).

**SIXTH CLAIM FOR RELIEF**

(NEPA Violation: Failure To Adequately Evaluate Impacts)

177.   The allegations contained in paragraphs 1-148 are incorporated herein by reference.

178.   NEPA and its implementing regulations require federal agencies to take a "hard look" at the environmental impacts of proposed actions using the best available scientific information.  42 U.S.C. § 4332.

179.   In the Arizona Strip FEIS, BLM failed to take a hard look at the direct, indirect, and cumulative impacts of the designated transportation network and travel

management plans in the Grand Canyon-Parashant and Vermilion Cliffs National Monuments. These impacts include effects on cultural resources, fish and wildlife resources, wildlife habitat, and riparian areas.

180.     BLM also failed to take a hard look at the direct, indirect, and cumulative impacts caused by authorized grazing in the Grand Canyon-Parashant and Vermilion Cliffs National Monuments, particularly the impacts on fish and wildlife resources, wildlife habitat, and riparian areas. BLM's reliance on future monitoring in lieu of completing this analysis violates NEPA and its implementing regulations.

181.     As a result, BLM's conclusions regarding the impacts of its designated transportation network, travel management plans, and approved grazing are not supported by the evidence in the FEIS.

182.     BLM's failure to complete an adequate analysis in the Arizona Strip FEIS and failure to support its conclusions violated NEPA and its implementing regulations and was arbitrary, capricious, or otherwise not in accordance with law within the meaning of the APA. 5 U.S.C. § 706(2)(A).

## SEVENTH CLAIM FOR RELIEF
### (Violation of NHPA)

183.     The allegations contained in paragraphs 1– 148 are incorporated herein by reference.

184.     The NHPA requires that a federal agency shall, "prior to the issuance of any license . . . take into account the effect of the undertaking on any district, site,  building, structure, or object that is included in or eligible for inclusion in the National Register [of Historic Places]."  16 U.S.C. § 470f.

185.   The NHPA's implementing regulations require that an "agency official shall determine whether the proposed Federal action is an undertaking as defined in [36 C.F.R.] § 800.16(y) and, if so, whether it is a type of activity that has the potential to cause effects on historic properties."  36 C.F.R. § 800.3(a).

186.   If the undertaking has the potential to affect historic properties, the federal agency must  "make a reasonable and good faith effort" to identify all historic properties within the areas of potential effects.  *Id.* § 800.4(b)(1).  The "[a]rea of potential effects" is defined as "the geographic area or areas within which an undertaking may directly or indirectly cause alterations in the character or use of historic properties."  *Id.* § 800.16(d). Adverse effects include direct, indirect, and cumulative effects.  *Id.* § 800.5(a)(1).

187.   The agency must then assess any adverse effects of the undertaking and resolve those effects prior to carrying out the undertaking.  *Id.* §§ 800.5, 800.6.

188.   Federal agencies must consult with the SHPO, Native American tribes, and other parties with a demonstrated interest in the undertaking regarding effects to historic properties.  *Id.* §§ 800.2(d), 800.3(f)(2), 800.4(b), (c).

189.   BLM's designated transportation network and travel management plans for the Grand Canyon-Parashant and Vermilion Cliffs National Monuments are undertakings under the NHPA that have the potential to affect historic properties.

190.   BLM did not consult with the SHPO, Native American tribes, or the public regarding BLM's designated transportation network and travel management plans prior to issuing the RODs that approve and adopt the Grand Canyon-Parashant and Vermilion Cliffs resource management plans.

191.   BLM did not adequately assess the effects of the RMPs' designated

1  transportation network and travel management plans on historic properties prior to issuing

2  the RODs and approving the Grand Canyon-Parashant and Vermilion Cliffs RMPs.

3        192.   BLM's conclusion that the designated transportation network and travel

4  management plans will not affect historic properties in the Monuments is unsupported by

5  the evidence in the record.

6

7        193.   BLM's failure to assess these effects, support its conclusions in completing

8  its route designations, and consult with the appropriate parties prior to issuing the RODs

9  and approving the Grand Canyon-Parashant and Vermilion Cliffs RMPs violated the

10  NHPA and its implementing regulations and was arbitrary and capricious, or otherwise not

11  in accordance with law, and/or constitutes agency action unlawfully withheld within the

12  meaning of the APA.  5 U.S.C. § 706.

13

14                          **PRAYER FOR RELIEF**

15

16        Plaintiffs respectfully request that the Court enter judgment against Defendants and

17  provide the following relief:

18

19      1.     Declare that defendants violated the Grand Canyon-Parashant and Vermilion

20             Cliffs National Monument Proclamations, NEPA, FLPMA, and the NHPA as

21             set forth above;

22      2.     Declare unlawful and set aside the final resource management plans for the

23             Grand Canyon-Parashant and Vermilion Cliffs National Monuments;

24

25      3.     Declare unlawful and set aside the Utah Wilderness Settlement;

26      4.     Issue an injunction ordering BLM to immediately close "primitive roads" and

27             "trails" to motorized and mechanized use in order to comply with the

28             National Monument Proclamations;

40

5. Award Plaintiffs' costs and reasonable attorneys' fees; and

6. Provide such other declaratory and injunctive relief as the Court deems just and proper.

Dated: May 1, 2009                              Respectfully submitted,


                                                *s/ James S. Angell*
                                                James S. Angell
                                                McCrystie Adams
                                                Earthjustice
                                                1400 Glenarm Place, Suite 300
                                                Denver, CO 80202
                                                jangell@earthjustice.org
                                                madams@earthjustice.org
                                                Phone: 303-623-9466
                                                Fax: 303-623-8083

                                                Attorneys for Plaintiffs

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 1, 2009, I electronically transmitted the foregoing FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

**Luther Langdon Hajek**
US Dept of Justice ENRD
PO Box 663
Ben Franklin Station
Washington , DC 20044-0663
202-305-0492
Fax: 202-305-0274
Email: luke.hajek@usdoj.gov
*Attorney for Defendants*

<u>/s/ James S. Angell</u>