**WO**

1

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                        FOR THE DISTRICT OF ARIZONA

8

9   The Wilderness Society, et al.,          )    No. 09-CV-8010-PCT-PGR
                                             )
10          Plaintiffs,                       )
                                             )
11  vs.                                      )    **ORDER**
                                             )
12  United States Bureau of Land             )
    Management, et al.,                      )
13                                           )
            Defendants.                       )
14  ─────────────────────────────────       )

15          Before the Court are the parties' motions for summary judgment. (Docs. 51, 63.)

16  Plaintiffs, The Wilderness Society and other environmental groups, challenge Resource

17  Management Plans ("RMPs") drafted by the Bureau of Land Management ("BLM") for the

18  Grand Canyon-Parashant and Vermillion Cliffs National Monuments, an area encompassing

19  1.3 million acres in the Arizona Strip District in northern Arizona.[1]

20          Plaintiffs filed an amended complaint on May 1, 2009. (Doc. 14.) BLM filed its

21  answer on May 15, 2009. (Doc. 18.) Plaintiffs filed their motion for summary judgment on

22  September 15, 2010. (Doc. 51.) BLM filed a cross-motion for summary judgment on

23  December 3, 2010. (Doc. 63.) Oral argument was held September 28, 2011. Based on a

24  review of the record and pleadings, Plaintiffs' motion for summary judgment is denied and

25  BLM's cross-motion for summary judgment is granted.

26

27          [1]      A companion case, *Center for Biological Diversity v. BLM*, 09-CV-8011-PCT-

28  PGR, raises challenges under the Endangered Species Act and the National Environmental
    Policy Act.

# I. BACKGROUND

The Grand Canyon-Parashant and Vermilion Cliffs National Monuments were established by President Clinton in 2000 pursuant to the Antiquities Act. *See* Proclamation 7265, Grand Canyon-Parashant, 65 Fed. Reg. 2825 (January 11, 2000); Proclamation 7374, Vermilion Cliffs, 65 Fed. Reg. 69227 (November 9, 2000). In accordance with Federal Land Policy and Management Act ("FLPMA"), BLM engaged in a land use planning process for the purpose of making management decisions regarding the Monument lands under its jurisdiction. BLM issued a Draft Resource Management Plan/Draft Environmental Impact Statement ("DEIS") for public comment in November 2005. (AR 58946.1.)[2] Following the review of comments on the DEIS, BLM prepared a Proposed Resource Management Plan/Final EIS ("FEIS"), which was issued in January 2007. In February 2008, after additional public comment, BLM issued a Record of Decision ("ROD") and RMPs for each of the Monuments. AR 62315, 62585. The RMPs contain overall direction for the management of the Monuments. AR 62325–27, 62596–97. They also implement BLM's decisions regarding the designation of routes for off-highway vehicle ("OHV") travel within the Monuments. AR 62327–28, 62597–99.

Plaintiffs allege that BLM violated the Proclamations establishing the Monuments, the FLPMA and related regulations, the National Environmental Policy Act ("NEPA"), and the National Historic Preservation Act ("NHPA"). Specifically, Plaintiffs claim that the RMPs allow vehicle use and livestock grazing that will harm Monument objects and that the BLM's proposed mitigation efforts are inadequate to address those harms. Plaintiffs also contend that BLM's road designation process ignored applicable regulations and failed to apply each of the required minimization criteria, and as a result the RMPs impermissibly favor motorized use. Plaintiffs further assert that BLM failed to perform an adequate

---

[2] "AR" refers to BLM's administrative record filed with the Court on June 3, 2010. (Doc. 43.)

inventory of historic properties prior to making travel-management decisions for the Monuments. Finally, Plaintiffs argue that BLM, relying on the so-called "Utah Wilderness Settlement," failed to consider the alternative of implementing Wilderness-level protections for the Monuments.

BLM counters that it complied with the Proclamations and NEPA by managing the Monuments in a manner that protects management resources, by analyzing mitigation to prevent harm to such resources, and by prohibiting mechanized vehicles from traveling off road. BLM argues that its satisfied FLPMA and NEPA with respect to management of lands with wilderness characteristics by considering a range of alternatives for the protection of such lands and selecting an alternative that maintains wilderness characteristics. Finally, it contends that it complied with NHPA by conducting a reasonable inventory of cultural and historic resources.

## II.   STATUTORY FRAMEWORK

### A.   FLPMA

BLM's land management authority is governed by the FLPMA, which directs the agency to manage public lands for multiple uses and sustained yield. The FLPMA declares that "public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use." 43 U.S.C. § 1701(a)(8). "In the FLPMA, Congress created a broad statutory framework setting forth the goals and management requirements that it envisioned for public lands." *Gardner v. BLM*, 638 F.3d 1217, 1222 (9th Cir. 2011).

To meet the directives of the FLPMA, BLM creates an RMP, which "describes, for a particular area, allowable uses, goals for future condition of the land, and specific next

steps." *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 59 (2004). Because the FLPMA "does not prescribe discrete agency action that must be taken" in a particular case, *Gardner*, 638 F.3d at 1222, the RMP does not include a decision whether to undertake or approve any specific action.

## B.  NEPA

NEPA requires federal agencies to consider the consequences of their actions on the environment. NEPA's mandate is "essentially procedural. . . . It is to insure a fully informed and well considered decision." *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 558 (1978). "NEPA itself does not mandate particular results, but simply prescribes the necessary process." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). Its goals are to ensure the agency will have detailed information on significant environmental impacts when it makes its decisions and guarantee that this information will be available to a larger audience. *Id.* at 349.

Under NEPA, an environmental impact statement ("EIS") is required for "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(c). "A properly prepared EIS ensures that federal agencies have sufficiently detailed information to decide whether to proceed with an action in light of potential environmental consequences." *Oregon Environmental Counsel v. Kunzman*, 817 F.2d 484, 492 (9th Cir. 1986).

When the adequacy of an EIS is challenged in court, the relevant inquiry is whether the EIS takes a "hard look" at all potentially significant environmental effects. "The only role for a court is to insure that the agency has taken a 'hard look' at environmental consequences; it cannot interject itself within the area of discretion of the executive as to the choice of the action to be taken." *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976).

A challenge to an EIS evaluation of environmental effects is subject to deferential review, with due consideration given to the agency's expertise. *Salmon River Concerned*

*Citizens v. Robertson*, 32 F.3d 1346 (9th Cir. 1994). A court should apply a "rule of reason" and determine only whether the EIS "contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences." *Half Moon Bay Fishermans' Ass'n v. Carlucci*, 857 F.2d 505, 508 (9th Cir. 1988); *see Or. Envtl. Council*, 817 F.2d at 492 (explaining that "reviewing court may not 'fly speck' and EIS and hold it insufficient on the basis of inconsequential, technical deficiencies."). A court may not substitute its judgment for that of the agency. *See Kleppe*, 427 U.S. at 410.

### C.    NHPA

The National Historic Preservation Act requires federal agencies to take into account the effect of an undertaking on sites or structures that are included in or eligible for inclusion in the National Register of Historic Places. 16 U.S.C. § 470f. Like NEPA, "NHPA is a 'stop, look, and listen' provision that requires each federal agency to consider the effects of its programs." *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 805 (9th Cir. 1999). NHPA requires an agency to make a reasonable and good faith effort to identify historic properties, assess the effects of the undertaking, and avoid or mitigate any adverse effects. *Id.* The agency must confer with the State Historic Preservation Officer ("SHPO") and seek the approval of the Advisory Council on Historic Preservation.

### III.    STANDARD OF REVIEW

A motion for summary judgment must be granted when there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Judicial review of final agency actions is governed by the Administrative Procedure Act ("APA"), 5 U.S.C. § 701.  *See Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of the Navy*, 898 F.2d 1410, 1413 (9th Cir. 1990).  The court shall set aside any agency decision that it finds "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

The court must determine whether the agency decision "was based on a consideration

of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971). An action is arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). A court may not substitute its judgment for that of the agency or merely determine that it would have decided an issue differently. *See Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 377 (1989). Although the arbitrary and capricious standard "is narrow and presumes the agency action is valid . . . it does not shield agency action from a 'thorough, probing, in-depth review.'" *Northern Spotted Owl v. Hodel*, 716 F.Supp. 479, 481–82 (W.D.Wash. 1988) (quoting *Overton Park*, 401 U.S. at 415).

## IV.    DISCUSSION

### A.    Proclamations: Protection of Monuments objects

Pursuant to the Proclamations, BLM is mandated to "protect" Monument objects. *See* 65 Fed. Reg. 2825 (Grand Canyon-Parashant); 65 Fed. Reg. 69227 (Vermillion Cliffs). The Proclamations provide that, "The Secretary of the Interior shall manage the monument through the Bureau of Land Management, pursuant to applicable legal authorities, to implement the purposes of this proclamation." 65 Fed. Reg. at 69229; *see* 65 Fed. Reg. at 2828.

As noted above, BLM manages federal land under the authority of the FLPMA. *See Western Watersheds Project v. Bureau of Land Management*, 629 F.Supp.2d 951, 967 (D.Ariz. 2009); *In re Montana Wilderness Association*, --- F.Supp.2d ----, 2011 WL 3489699 at *3 (D. Mont. 2011). FLPMA states that BLM "shall manage the public lands under principles of multiple use and sustained yield . . . except that where a tract of such public land

has been dedicated to specific uses according to any other provisions of law it shall be managed in accordance with such law." 43 U.S.C. § 1732(a). The parties agree that BLM was required to abide by the "other laws" set forth in the Proclamations, which mandate the protection of Monument objects. *See* AR 62340. Beyond directing BLM manage the Monuments pursuant to applicable authority, the Proclamations do not dictate a particular approach to protecting Monument objects. As set forth below, the Court finds that BLM's management decisions did not violate the Proclamations.

Chapter 4 of the FEIS sets forth BLM's analysis of the impacts of travel, vegetation and fire management, recreation, and livestock grazing on Monument resources, including air, water, soils, geology and paleontology, vegetation, fish and wildlife, special status species, wild burros, cultural and visual resources, and wilderness characteristics. AR 60845–61233. The RMPs include management actions designed to protect these resources. *See* AR 62373–74, 62665–66 (geology and paleontology), 62407–08, 62716–18 (cultural resources), and 62388–406, 62687–715 (fish and wildlife).

The RMPs restrict allowable uses in the Monuments, particularly with respect to transportation, grazing, and recreation. AR 62344–46, 62632–35. The RMPs close 89,598 acres in Vermillion Cliffs to motorized and mechanized vehicle use, and 285,647 acres in Grand Canyon-Parashant. AR 62438–39, 62748–50. They also close 360 miles of routes that were in use prior to the issuance of the RMPs. *See* AR 60576, 62439, 62749. This figure represents approximately 18 per cent of the existing miles of routes in the Monument.

The Court finds that the RMPs' management actions with respect to livestock grazing adequately protect Monument resources. The Proclamations specifically allow continued grazing. *See* 65 Fed. Reg. 2828. The RMPs do not designate any new grazing allotments, AR 62419, 62729, and make unavailable approximately 34,000 acres in Parashant that were previously available for grazing. AR 60320, 62729. The RMPs also establish new standards and management actions to protect rangeland health. *See* AR 62419–21, 62729–33.

Moreover, the RMPs do not authorize any specific grazing activity. Instead, in order to graze livestock, ranchers must obtain permits from BLM, which are subject to additional regulatory review. AR 60779–81.

Plaintiffs assert that the RMPs travel management decisions will result in "dramatic and fundamental impacts" to Monument objects, including historical and archeological resources. While the RMPs do not open new routes that would provide greater access to such resources, BLM acknowledges that its travel management decisions would have a "moderate" impact on archeological and historical objects, AR 61035; that is, the adverse impact would be "measurable and perceptible" and "would change one or more character-defining features" but not "diminish the integrity of the resource." AR 61019. Impacts on geological and paleontological resources would be "minor" (or "hardly perceptible") to "moderate." AR 60906, 60899. Plaintiffs argue that these effects are not compatible with the Proclamations' mandate to protect Monument objects.

In drafting the RMPs, BLM explained that "[g]iven the broad mandate in the Proclamations and the vast Monument lands that were placed under its management, [it] did not interpret the Proclamations and its obligations under the [FLPMA] as requiring it to prepare RMPs containing detailed plans for every single object in the Monuments." (Doc. 73 at 3.) Instead, BLM adopted a "holistic" approach to managing the Monuments, with management "goals that recognize important relationships and interdependencies among the listed objects and the natural and cultural districts of which they are a part." AR 61551.

The Court finds that this approach was reasonable. The Monuments consist of more than a million acres of remote land which BLM is charged with managing under the Proclamations and FLPMA. There is no controlling legal authority mandating that BLM carry out its responsibilities in a particular way. Instead, the Court finds persuasive the analysis offered by the district court in *Montana Wilderness Society*. 2011 WL 3489699. At issue there were challenges to RMPs for the Upper Missouri Breaks National Monument in

Montana. BLM had adopted a management approach that sought to "reconcile" the requirements of the Proclamations and FLPMA's multiple-use standard. *Id.* at *3. The court paid deference to BLM's interpretation of its responsibilities and concluded that "BLM did not denigrate the Proclamation by choosing also to abide by multiple use principles. . . . The interpretation that providing for multiple use was required so long as Monument objects were protected was reasonable." *Id.*

Finally, Plaintiffs assert that BLM was required to perform an "impairment analysis to determine whether the RMPs will run afoul of the Proclamations." (Doc. 52 at 9.) Plaintiffs argue that this "substantive duty" to protect Monument objects represents a second analytical step, in addition to the procedural requirements of NEPA. (*Id.*, n.5.) The Court is unpersuaded. As previously noted, the Proclamations direct BLM to manage the Monuments under "applicable legal authorities," which for BLM is the FLPMA. They do not dictate that BLM follow a particular course in fulfilling its duty to protect Monument objects.[3]

The Court concludes that BLM fulfilled its obligations under the Proclamations and FLPMA by evaluating the potential impacts of the RMPs on Monument resources and values. BLM took significant steps to reduce impacts of vehicle travel and grazing, the two uses that Plaintiffs claim will harm Monument objects. Therefore, the RMPs establish a management framework that fulfills the Proclamations' mandate to protect Monument objects.

**B.    NEPA**

Under NEPA, an EIS must discuss "'any adverse environmental effects which cannot be avoided should the proposal be implemented.'" *Robertson v. Methow Valley Citizens*

---

[3]    As BLM notes, the Proclamation establishing Grand Canyon-Parashant Monument directed that the National Park Service ("NPS") manage portions of the Monument. 65 Fed. Reg. at 2828. Unlike BLM, NPS has a substantive duty under 16 U.S.C. § 1 "to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations."

*Council*, 490 U.S. 332, 351–52 (1989). Thus, an EIS needs to include "a reasonably complete discussion of possible mitigation measures." *Id.* at 352. NEPA does not contain, however, "a substantive requirement that a complete mitigation plan be actually formulated and adopted." *Id.* Such a requirement "would be inconsistent with NEPA's reliance on procedural mechanisms." *Id.* at 353.

A mitigation plan "need not be legally enforceable, funded or even in final form to comply with NEPA's procedural requirements." *National Parks & Conservation Ass'n v. United States Dep't of Transp.*, 222 F.3d 677, 681 n.4 (9th Cir. 2000). Instead, a court "need only be satisfied that the agency took the requisite 'hard look' at the possible mitigating measures. *Neighbors of Cuddy Mountain v. United States Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998). However, a "perfunctory description" is not adequate to satisfy NEPA's requirements, *id.*, and a "mere listing" of mitigating measures, without supporting analytical data, is likewise inadequate, *Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1151 (9th Cir. 1998).

In *Methow Valley*, the Supreme Court analyzed the adequacy of an EIS that examined the environmental impact of a proposed ski resort on National Forest land. 490 U.S. 332. The EIS stated that the proposed project would not have a measurable effect on existing air quality, but that the off-site development of private land would have a significant effect. The EIS then identified potential actions that could be taken by county governments to mitigate those adverse impacts, including the development of an air-quality management plan. The Ninth Circuit Court of Appeals held that the EIS was inadequate because the effectiveness of the mitigation measures had not been assessed and the measures themselves had yet to be developed. The Supreme Court reversed. *Id.* at 353. While stating that an EIS without a "reasonably complete discussion of possible mitigation measures would undermine the 'action-forcing' function of NEPA," the Court explained that "[t]here is a fundamental distinction . . . between a requirement that mitigation be discussed in sufficient detail to

ensure that environmental consequences have been fairly evaluated, on the one hand, and a substantive requirement that a complete mitigation plan be actually formulated and adopted, on the other." *Id.* at 352. The Court concluded that, because the EIS predicted that the on-site environmental impacts would be minimal, the proposed measures "cannot be deemed overly vague or underdeveloped." *Id.* at 358.

As the Ninth Circuit noted in *Okanogan Highlands Alliance v. Williams*, 236 F.3d 468, 473 (9th Cir. 2000), the difference between adequate and inadequate mitigation discussions "appears to be one of degree." For example, in *Cuddy Mountain* the court of appeals rejected an EIS because it appeared that "the Forest Service *did not even consider* mitigating measures for the creeks actually affected by the [timber] sale." 137 F.3d at 1381 (emphasis added). By contrast, a review of the EIS at issue in *Okanogan* "suggest[ed] that the Forest Service *did* consider and take a 'hard look' at the environmental effects and mitigating measures," notwithstanding the fact "that the mitigating measures are described in general terms and rely on general processes, not on specific substantive requirements." 236 F.3d at 473. The court concluded that, "Because the actual adverse effects are uncertain, and the EIS considered extensively the *potential* effects and mitigation processes . . . the discussion of mitigating measures in the EIS is adequate." *Id.* The court explained that a "mitigation plan 'need not be legally enforceable, funded or even in final form to comply with NEPA's procedural requirements.'" *Id.* (quoting *National Parks & Conservation Ass'n v. United States Dep't of Transp.*, 222 F.3d 677, 681 n.4 (9th Cir. 2000)).

In *South Fork Band Council Of Western Shoshone Of Nevada v. U.S. Dept. of Interior*, 588 F.3d 718, 727 (9th Cir. 2009), the court reiterated that "NEPA, of course, does not require that these harms actually be mitigated." The court cautioned, however, that "[a]n essential component of a reasonably complete mitigation discussion is an assessment of whether the proposed mitigation measures can be effective. A mitigation discussion without at least *some* evaluation of effectiveness is useless in making that determination." *Id.*

Plaintiffs argue that BLM's mitigation measures are not sufficiently developed and that the agency may not rely upon an "adaptive mitigation" approach to satisfy NEPA. The Court disagrees.

First, as BLM notes, with the exception of the route designations, the RMPs are "general planning documents" which establish a framework for future actions but do not authorize any specific activities. *See* AR 62325–28.[4] In similar circumstances, courts have consistently accepted a programmatic approaches to mitigation. *See Friends of Yosemite Valley v. Norton*, 348 F.3d 789, 800–01 (9th Cir. 2003) (programmatic EIS prepared in conjunction with creation of a land management plan for Yosemite was sufficient at the implementation stage and provided guidelines for future actions); *Northern Alaska Envtl. Ctr. v. Lujan*, 961 F.2d 886 (9th Cir. 1992) (programmatic EIS prepared in conjunction with approval of mining in Alaskan parks was adequate); *see also Jayne v. Rey*, --- F.Supp.2d ----, 2011 WL 337941, at *13 (D.Idaho January 29, 2011); *Western Organization of Resource Councils v. Bureau of Land Management*, 591 F.Supp.2d 1206, 1240 (D.Wyo. 2008); *Citizens for Better Forestry v. U.S. Dept. of Agriculture*, 481 F.Supp.2d 1059, 1085–86 (N.D.Cal. 2007). As the Ninth Circuit explained in *Northern Alaska Environmental Center*:

> In *California v. Block*, [690 F.2d 753 (9th Cir. 1982)], we were also confronted with the contention that a federal agency had failed to conduct an adequate study of all the issues that should be considered under NEPA in evaluating the first stage of a federal project. That project required additional studies before any further action would be taken that had an impact on the environment. In *Block* we held that in considering the adequacy of a largely programmatic EIS for a large scale, multi-step project, detailed analysis should be deferred until a "concrete development proposal crystallizes the dimensions of a project's probable environmental consequences." We announced that when

---

[4]     BLM considered five alternatives and chose Alternative E, which it "considered . . . to be the environmentally preferable alternative when taking into consideration the human (social and economic) environment as well as the natural environment" and "best meets . . . NEPA goals for the future management of the Monument." AR 62324. BLM explained that its preferred alternative provides "overall direction for management of all resources on BLM-administered land in the Monument." AR 62325.

a programmatic EIS is prepared, "site-specific impacts need not be fully evaluated until a 'critical decision' has been made to act on site development."

961 F.2d at 890–91 (interior citations omitted).

BLM argues that the use of monitoring and adaptive management allow it the flexibility to address impacts at the time specific actions are implemented. Recognizing the validity of this principle, courts have found that adaptive mitigation is permissible under NEPA. *See Theodore Roosevelt Cons. P'ship v. Salazar ("TRCP")*, 616 F.3d 497, 515–17 (D.C. Cir. 2010) (upholding BLM's utilization of an adaptive management plan with respect to the approval of natural gas project); *see Western Watersheds Project v. Bureau of Land Management*, No. 3:11-cv-00053-HDM-VPC, 2011 WL 1630789, *3 (D.Nev. April 28, 2011) ("NEPA specifically allows agencies to utilize adaptive management plans that . . . monitor the real environmental effects of a project and allow the BLM to adapt its mitigation measures in response to the trends observed."); *Defenders of Wildlife v. Salazar*, 698 F.Supp.2d 141, 149 (D.D.C. 2010) (rejecting argument that adaptive mitigation strategy constituted a "plan to make a plan" and was not a reasonably complete discussion of mitigation). As the court explained in *TRCP*:

> The procedural requirements of NEPA do not force agencies to make detailed, unchangeable mitigation plans for long-term development projects. Through the adaptive management plan, the Bureau plans to monitor the real effects of the development it authorizes, and adapt its mitigation measures to specific drilling proposals in response to trends observed. Allowing adaptable mitigation measures is a responsible decision in light of the inherent uncertainty of environmental impacts, not a violation of NEPA. It is certainly not arbitrary or capricious.

*TRCP*, 616 F.3d at 517; *see Western Organization of Resource Councils v. Bureau of Land Management*, 591 F.Supp.2d at 1240 ("The programmatic EIS and ROD at issue in this case recognize that the process is not static and that it suffers from a certain amount of uncertainty and imperfect predictive abilities. These items also suggest that the approach adopted in this case, including requirements for further site-specific environmental analysis and mitigation, is appropriate and will be employed to make future decisions . . ."); *Pacific Rivers Council*

*v. U.S. Forest Service*, 2:05-cv-00953-MCE-GGH, 2008 WL 4291209, at *14 (E.D.Cal. September 18, 2008) (finding that "Forest Service is not prohibited from waiting until site-specific actions are developed before analyzing mitigation measures in more detail.").

The Court also concludes that the RMPs, notwithstanding their programmatic nature and use of monitoring and adaptive strategies, contain a sufficient discussion of mitigation measures. These are set forth in Chapter 2 ("Alternatives") and Chapter 4 ("Environmental Impacts") of the FEIS, AR 60378–614, 60855–61233, and include mitigation with respect to land health standards, conservation measures to mitigate effects on special status species, and reclamation stipulations for surface-disturbing activity.

The RMPs specifically propound and analyze mitigation measures with respect to travel and grazing. For example, to protect Monument objects the RMPs limit all vehicular travel to designated routes. BLM also retains "management discretion to limit or close a route . . . to protect Monument objects." AR 60573; *see* AR 60575–78. Moreover, "[r]outes created by unauthorized use would be immediately obscured and rehabilitated," with barriers installed to prevent unauthorized use, and "[r]outes causing resource damage or with safety concerns could be rerouted and/or reclaimed." AR 60579.

The RMPs also contain specific provisions to protect biological and cultural resources. *See, e.g.*, AR 62403 ("Roads and trails used by OHVs within riparian areas, or areas with the potential to support riparian vegetation, will be closed and rehabilitated."); AR 62407 ("Monument objects [ ] will be identified, conserved, protected, stabilized, or restored, and maintained in good or better condition."); AR 62408 ("Protective measures will be taken to preserve significant sites, such as monitoring through patrol, signing, fencing, data recovery to mitigate vandalism, and stabilizing undamaged deposits, and preserving at risk features such as standing walls or historic structures."); AR 62702, 62730 (limiting grazing to prevent harm to biological resources).

As BLM notes, the FEIS contains an extensive discussion of its management of

grazing in the Monuments. The FEIS sets out the rangeland health standards described in Arizona Standards for Rangeland Health and Guidelines for Grazing Administration. AR 60357–61, 61597–608. These standards outline management practices and actions for the protection of soils, wetlands, and wildlife. AR 60358–62, 61602–08. BLM implements the Arizona rangeland health standards in conjunction with state and local entities and tracks the progress in implementing the standards. AR 61607–08, 61619–23. Management practices are to be reviewed and evaluated to determine whether the rangeland standards are being met, and appropriate management actions are to be taken where standards are not being met. AR 60509. Further, portions of Parashant will be managed as a "forage reserve," meaning that "any livestock use would be on a temporary basis . . . at BLM's discretion and would be designed to complement management of other resources and to provide rest and deferment on other allotments." AR 60509. The FEIS also describes a number of other restrictions and limitations on particular allotments in the Monuments. AR 60509–15.

The FEIS also discusses the effectiveness of the mitigation measures applicable to livestock grazing. *See, e.g.*, AR 60871 ("Closing sensitive areas to grazing would help improve water quality and return riparian areas to proper functioning conditions."); AR 60885 (closing certain grazing allotments "would reduce the amount of surface disturbance, compaction, and erosion from grazing activities."); AR 60916 ("[s]eason of use restrictions may lessen the effects of grazing"); AR 60971 ("Grazing would be managed in accordance with Arizona Standards for Rangeland Health, reducing impacts to minor levels on all lands within the Monument.").

The FEIS includes discussions of the effectiveness of these mitigation measures in its analysis of other environmental impacts. *See, e.g.*, AR 60864 ("Overall, impacts [to air quality], however, would be reduced as the public would have access to fewer miles of unpaved roads and a number of roads would be closed and rehabilitated, decreasing the potential for fugitive dust throughout the Monuments."); AR 60900 (prohibition of off-road

- 15 -

vehicle use will "reduce erosion, trampling, vandalism, and other surface disturbing impacts that damage geological and paleontological resources."); *see also* AR 60856–57 (prohibiting OHV use and limiting travel on designated roads would "limit impacts to air quality"; use of watering and chemical suppressants would "greatly reduce the amount of dust emissions from maintenance and on haul roads"); AR 60869 ("The application of specific mitigation measures identified in activity level planning and NEPA level review would reduce or prevent impacts to water quality."); AR 60883 ("Restoration and vegetation treatment projects aimed at improving vegetation health and cover would reduce erosion potential and increase soil productivity."); AR 60958 (use restrictions on recreational activities and camping "should reduce or eliminate adverse effects to wildlife"); AR 60998-61002 ("Restricting surface-disturbing activities to the non-breeding season for Southwestern Willow Flycatchers would eliminate disturbance effects from noise and dust. Direct impacts from loss of habitat would be limited or eliminated as a result of floodplain restrictions").

The mitigation described in the FEIS is sufficient to meet BLM's legal obligations under NEPA. BLM was not required to have a completed mitigation plan in place when it drafted the RMPs. *See Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 955 (9th Cir. 2008). As already noted, the RMPs are general planning documents and, except for the route designations, BLM did not implement any specific decisions or approve any projects.[5]

Plaintiffs cite *South Fork Band Council of W. Shoshone of Nevada*, 588 F.3d at 727, and *Neighbors of Cuddy Mountain*, 137 F.3d at 1381, in support of their argument that BLM failed to adequately discuss the effectiveness of the proposed mitigation. In those cases, however, BLM was responsible for administering land on which specific actions were

---

[5]     As BLM notes, future actions, such as approval of permits for livestock grazing, will undergo further NEPA analyses to assess mitigation specific to those actions. (*See* AR 61233.)

proposed—the expansion of a gold-mine operation and timber sales in a national forest, respectively. Therefore, a programmatic approach to mitigation was not appropriate, and BLM violated NEPA by failing to propose and analyze the effectiveness of specific mitigation measures to address the effects of the new activities. Here, by contrast, BLM was not required to analyze the effectiveness of mitigation measures for site specific actions because none were approved in the RMPs.

In sum, BLM satisfied NEPA by taking a hard look at the impacts of grazing and OHV use. "While it may have been possible to explore impacts more vigorously and discuss them more thoroughly, reality of process requires the agency to make a decision. It has done so here." *Montana Wildlife Association*, 2011 WL 3489699 at *9–10 (concluding that "Plaintiffs have failed to demonstrate that the impacts analysis within the over 1,200-page FEIS failed to take the requisite hard look.").

## C.    Route designations

Plaintiffs assert that the route designations promulgated by BLM violate the Proclamations, OHV regulations, and NEPA. Specifically, Plaintiffs contend that the route designations favor motorized uses and fail to consider minimization criteria. The Court disagrees.

The Proclamations prohibit "all motorized and mechanized use off road." *See* 65 Fed. Reg. 2827. The Proclamations do not define the word "road."

The RMPs do not allow vehicle use off of designated roads. Instead, OHV travel is allowed only on "roads" and "primitive roads." Plaintiffs first contend that by allowing travel on primitive roads as well as roads, the RMPs violate the Proclamations' prohibition on OHV use. (*See* Doc. 52 at 9–13.)

BLM's current definition of road is set forth in the 2006 Roads Report, which defines a road as "a linear route declared a road by the owner, managed for use by low-clearance vehicles having four or more wheels, and maintained for regular and continuous use." AR

42201. Prior to the 2006 report, routes were classified as either roads or trails.[6] Because these definitions were not consistently applied, BLM established a third category, "primitive roads." AR 42198–99. A "primitive road" is a "linear route managed for use by four-wheel drive or high-clearance vehicles." AR 42201.

BLM's definitions or road and primitive road are entitled to deference and may be overruled only if clearly erroneous. *See Montana Wildlife Association*, 2011 WL 3489699 at *5; *see also Al Haramain Islamic Foundation, Inc. v. U.S. Dept. of Treasury*, 585 F.Supp.2d 1233, 1248 (D.Or. 2008) ("Courts give deference to an agency's interpretation of the executive orders it is charged with administering.") (citing *American Fed'n of Gov't Employees v. Fed. Labor Relations Auth.,* 204 F.3d 1272, 1274–75 (9th Cir. 2000), and *Kester v. Campbell*, 652 F.2d 13, 15–16 (9th Cir. 1982)). In *Montana Wildlife Association*, the district court rejected the plaintiff's argument that BLM's definition of road, which included unmaintained, user-created two-track routes, was insufficiently restrictive. 2011 WL 3489699 at *5. Noting that "[t]here is no suggestion . . . that the President intended BLM to define a road based upon definitions outlined by Plaintiffs," the court concluded that "BLM was free to choose the definition as it deemed most appropriate" and that the plaintiff had made no showing that "the chosen definition is unreasonable, rendering it arbitrary and capricious." *Id.*

Similarly, BLM's definition of roads and primitive roads is entitled to deference. There has been no showing that these definitions conflict with the Proclamations' prohibition of off-road motor vehicle use. The court concludes that the BLM definition of primitive road, which is similar to the definition of road in *Montana Wilderness Society*, is reasonable.[7]

---

[6] In a BLM's Engineering Manual road was defined as "a transportation facility used primarily by vehicles having four or more wheels . . . and maintained for regular and continuous use." AR 41333.

[7] The Court rejects Plaintiffs' argument that BLM's route designations will harm Monument objects by allowing travel on trails. The RMPs, as revised, expressly prohibit

Plaintiffs next claim that BLM's route designation process resulted in a violation of regulations governing OHV use pursuant to 43 C.F.R. § 8342.1. Plaintiffs' critique centers on BLM's use of a so-called Route Evaluation Tree ("RET") in making its route designations.

BLM describes its route-designation process as follows:

> First, BLM gathered information about the routes and identified: resource constraints and access needs, geographical units defined by common issues or management goals, areas where resource constraints and public access conflicted, and priority subregions. Second, BLM refined the data, identified any deficiencies in the data, and prioritized the resolution of those deficiencies. Third, BLM prepared for Route Evaluation by mapping the regions and reviewing the effects of motorized routes on resources. Fourth, BLM then used the RET to evaluate routes. Fifth, BLM reviewed and recorded the RET's recommendations, and decided whether they were appropriate. Finally, the route designations were reviewed during the NEPA process as part of the RMPs. Thus, the RET is but one step in an extensive process designed to consider all of the minimization criteria.

(Doc. 64 at 16 (citations omitted).) *See* AR 61748–49.

Plaintiffs contend that the RETs did not allow for the proper application of the minimization criteria set forth in § 8342.1, which provides:

> The authorized officer shall designate all public lands as either open, limited, or closed to off-road vehicles. All designations shall be based on the protection of the resources of the public lands, the promotion of the safety of all the users of the public lands, and the minimization of conflicts among various uses of the public lands; and in accordance with the following criteria:
>
> (a) Areas and trails shall be located to minimize damage to soil, watershed, vegetation, air, or other resources of the public lands, and to prevent impairment of wilderness suitability.
>
> (b) Areas and trails shall be located to minimize harassment of wildlife or significant disruption of wildlife habitats. Special attention will be given to protect endangered or threatened species and their habitats.
>
> (c) Areas and trails shall be located to minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands, and to ensure the compatibility of such uses with existing conditions in populated areas, taking into account noise and other factors.

---

OHV travel on trails. AR 62330. (*See* Doc. 64 at 14.)

(d) Areas and trails shall not be located in officially designated wilderness areas or primitive areas. Areas and trails shall be located in natural areas only if the authorized officer determines that off-road vehicle use in such locations will not adversely affect their natural, esthetic, scenic, or other values for which such areas are established.

Specifically, Plaintiffs claim that the RETs "shed no light on how each route was located to minimize impacts" and "at no point in the route evaluation process did [BLM] claim to have actually minimized the impact of ORV routes." (Doc. 70 at 12.) They also argue that BLM was required to consider all minimization criteria, but the RETs did not explicitly consider noise and air. (Doc. 52 at 14–15.) BLM counters that the route designation process taken as whole, which consisted of application of the RETs followed by NEPA review, included a consideration of each of these criteria, including noise and air.

In support of its argument that the route designation process properly accounted for the OHV criteria, BLM notes that the Environmental Issues/Special Resources section of the RET directs BLM to "consider" the effect of routes on "special status species' habitat"; "wildlife migration routes or movement/dispersal corridors, critical winter range, etc."; "floodplains, wetlands, ephemeral or perennial creeks, streams, springs, seeps, or other natural water sources or bodies"; "cryptobiotic, highly erodible, or other sensitive or important soils"; "dry or wet meadows"; "specially-protected resources"; and "Monument objects." AR 61753–54. It also asks whether a "route degrade[s] wilderness values or the roadless character so as to disqualify an area from further consideration as a Wilderness Study Area," AR 61753, and directs BLM to "[e]mphasize closure or minimization of the use of routes through the habitat of any special status species when closure would likely result in benefit to the species." *Id.*

The minimization criteria also require that routes "not be located in officially designated wilderness areas or primitive areas." 43 C.F.R. § 8342.1(d). The RET directed BLM to evaluate whether a route would "provide access to and/or pass through, cross over, intersect, or otherwise affect . . . Wilderness." AR 61753. The RMPs do not allow OHV use

by the public in designated wilderness areas. AR 62444, 62754.

The RET also complies with the requirement to "minimize conflicts between off-road vehicle use and other existing or proposed recreational uses," 43 C.F.R. § 8342.1(c), by directing BLM to consider whether "non-motorized types of recreation uses [are] impacted by the presence of routes and vehicles." AR 61756. Moreover, the RET requires BLM to consider additional management options, such as seasonal limitations or group size restrictions, for the purpose of minimizing harm to the environment. AR 61754.

BLM acknowledges that the RET does not explicitly discuss the effect of the route designations on air quality and noise. It contends, however, that the issue was considered during the NEPA process, which occurred before the route designations were finalized, so that the final RMPs evaluated the impact of the route designations on air quality as required by 43 C.F.R. § 8342.1(a).

The Court agrees. The record indicates that during the NEPA process BLM considered the impacts of its route designation decisions on air quality. *See* AR 62083–84, 60855–56, 62663, 62371. BLM concluded, however, that impacts from route designations on air quality would be "negligible to minor" and "localized [to] short-term" and concluded that they could be minimized by closing routes, limiting routes to administrative routes, and mitigation measures such as watering and dust suppressants. AR 60857. Mitigation measures are an acceptable means of minimizing the impacts of routes in accordance with 43 C.F.R. § 8342.1. *See Sierra Club v. Clark*, 774 F.2d 1406, 1409–10 (9th Cir. 1985).

Likewise, BLM considered noise but determined that it was not "an important factor in minimizing conflicts with other recreational uses and ensuring the compatibility of those uses with existing conditions in populated areas, *see* 43 C.F.R. § 8342.1(c), because the Monuments were already 'naturally quiet' with existing motorized uses, and there are no populated areas within the Monuments." *See* AR 60753–55. The Court finds that BLM acted within its discretion when it concluded that noise was not a factor in minimizing conflicts

between uses, and that its determination was not unreasonable. *See Thomas Jefferson University v. Shalala*, 512 U.S. 504, 512 (1994).

Plaintiffs rely on *Center for Biological Diversity v. U.S. Bureau of Land Management ("CBD")*, 746 F.Supp.2d 1055 (N.D. Cal. 2009), *vacated in part*, 2011 WL 337364 (N.D. Cal. 2011), and *Idaho Conservation League v. Guzman*, 766 F.Supp.2d 1056 (D.Idaho 2011), for their argument that the RET process favors motorized use by failing to adequately consider minimization criteria. In *CBD*, the district court ruled that BLM's final FEIS failed to adequately consider the effects of its proposed redesign of OHV routes on wildlife, soils, vegetation, and other resources, in violation of 43 C.F.R. § 8342.1. *Id.*

In *CBD*, BLM used a Decision Tree as part of its route designation process. The court noted that the Decision Tree made no explicit reference to the minimization criteria of § 8342.1, and "[t]he only resource related questions . . . concern[ed] sensitive species and sensitive species' habitat, and several questions ask indirectly about soil erosion." *Id.* at 1076. As a result, application of the Decision Tree allowed routes to be classified as "open" without taking into account all of the minimization criteria set forth § 8342.1. *Id.* at 1077.

The court further explained that the Decision Tree dictated that a route could only be closed, "regardless of the level of impact on sensitive species or potential to mitigate cumulative effects, unless it either: (a) does not contribute to recreational opportunities, dispersed use, connectivity, public safety, etc.; or (b) . . . is redundant with other routes that provide the same opportunity." *Id.* The court cited BLM's approval of a particular route despite the fact that the route impacted the habitat of a sensitive species and its closure was likely to lead to increased conservation of sensitive species. *Id.* Pursuant to the Decision Tree, the route remained open because the following question was answered in the negative: "Are the commercial or private uses of this route adequately met by another route(s) that avoid or minimize the impact to occupied habitat of sensitive species?" *Id.*

The district court also rejected BLM's contention that other parts of the record

indicated that it applied the minimization criteria, explaining that neither the Decision Tree, its footnotes, nor the records for each designated route "reflect or document any analysis of the § 8342.1 minimization criteria." *Id.* at 1080.

BLM contends that unlike the Decision Tree at issue in *CBD*, the RET does not favor motorized use. It distinguishes the RET process from the Decision Tree by noting that the latter favored keeping routes open by posing questions regarding the benefits of closing a route (*e.g.*, "is route closure likely to lead to increased conservation of sensitive species?"). *CBD*, 746 F.Supp.2d at 1077. Thus, the questions asked by the Decision Tree allowed route designation decisions "without the minimization of environmental impacts and conflicts between uses" and therefore were "almost certain to skew route designation decision-making in favor of ORV use." *Id.* (quoting *American Motorcyclist Ass'n v. Watt*, 543 F.Supp. 789, 797 (C.D.Cal 1982)).

By contrast, the RET used here to designate routes in the Monuments posed questions regarding the consequences of keeping a route open—for example, "[m]ight the continued use of this route impact State or Federal status species?" AR 61753. Under the RET, route closures do not need to be justified by showing that they are "likely to lead to increased conservation." *CBD*, 746 F.Supp.2d at 1077. Instead, a route may be closed, for example, if keeping it "[m]ight" impact listed species. AR 61753. This shift in approach means that the RETs disfavored motor vehicle use, resulting in the closure of routes based on the minimization criteria, even if the routes provided recreational access that was not available on other routes. *See, e.g.,* AR 52871–72.

In *Idaho Conservation League*, the district court held that the Forest Service's travel management plan failed to implement the minimization criteria of § 8342.1. 766 F.Supp.2d at 1074.[8] The court explained

---

[8]    The Travel Management Rule under which the Forest Service operated was substantively indistinguishable from 43 C.F.R. § 8342.1. 766 F.Supp.2d at 1074.

that the whole goal or purpose of the exercise is to select routes in order to minimize impacts in light of the agency's other duties. Simply listing the criteria and noting that they were considered is not sufficient to meet this standard. Instead, the Forest Service must explain how the minimization criteria were applied in the route designation decisions.

The court noted, as the court did in *CBD*, that "there is no evidence reflecting how the Forest Service applied the minimization criteria." *Id.*

Here, by contrast, there is evidence that BLM applied the minimization criteria. This is reflected in the reports prepared for each route. (Doc. 77 at 4–5.) Each Route Evaluation Report ("RER") considered whether the continued use of the route would impact, directly or indirectly, "special resources," including, for example, special status species or their habitat. *See, e.g.*, AR 53858. The RER then asked whether impacts to the those resources can be "avoided, minimized or mitigated" and records BLM's response. *Id.* Finally, the RER documents BLM's decision regarding the route—i.e., close, mitigate limit, limit, mitigate open, or open the route. AR 53859. Based on this process, BLM closed certain routes and imposed conditions on other routes to minimize or mitigate impacts. *See, e.g.*, AR 52885–87, 53303–04, 53858–59.[9]

---

[9]      BLM cites instances in which it limited access to minimize the impacts of routes. Several RERs reveal that BLM identified impacts to sensitive resources but determined that they could "be avoided, minimized or mitigated" through "adaptive management monitoring of status/integrity of identified sensitive resources or special status species and/or cultural resources as their condition might relate to intensity and type of public use." For example, with respect to route V1003J, BLM determined that the route impacted Monument objects and other resources identified in the route designation criteria, such as wildlife and recreational uses. AR 52885–87. BLM then determined that impacts to sensitive resources could be avoided, minimized or mitigated, and specified that the route would only be open to administrative and grazing permittee use. *Id.*

BLM also closed routes after considering their impacts on Monument objects and resources listed in the designation criteria. For example, BLM determined that route V1121B impacted plants, primitive recreation, wilderness areas, and Monument objects. AR 53858. BLM closed the route. AR 53859. Similarly, the RER for route V1028A shows that BLM determined that route closure or some other form of mitigation would address cumulative effects on habitat fragmentation. AR 53303–04. BLM then closed the route to all uses. *Id.*;

BLM met the standard set by the courts in *CBD* and *Idaho Conservation League*. The RERs show that BLM considered impacts to Monument objects and other resources described in § 8342.1, and that it took action to minimize the impacts of routes on those resources by closing the routes or adopting mitigating measures.

### D.    NHPA

Plaintiffs claim that BLM violated Section 106 of the National Historic Preservation Act, which directs any federal agency with "jurisdiction over a proposed or federally assisted undertaking to . . . take into account the effect of the undertaking on any . . . site . . . that is included in or eligible for inclusion in the National Register." 16 U.S.C. § 470f; *see* 36 C.F.R. § 800.4(b)(1).

Plaintiffs contend that BLM failed to make a good faith effort to inventory historic properties in the Monuments because it relied on a "Class I" inventory, or a review of existing data. According to Plaintiffs, under this approach BLM, when it issued its RMPs, "had no information on historic properties for over 95% of the Monuments" and the information it had regarding other five percent was "dated and scientifically inadequate data." (Doc. 70 at 18.)

In support of their argument that BLM's the cultural inventory was inadequate, Plaintiffs cite a 2006 report prepared by Peter Bungart, who opined that BLM's route designation plan will harm cultural resources in the Monuments. AR 54510. However, while BLM considered the Bungart report when assessing site-specific impacts and the necessity for additional field inventories, AR 36548, 61321, it was entitled to rely on the opinions of its own experts who determined, based on the available data on cultural resources, that the impacts on cultural resources would be "moderate." AR 61026, 61035. *See Lands Council*, 537 F.3d at 993 ("[W]e are to conduct a 'particularly deferential review' of an 'agency's predictive judgments about areas that are within the agency's field of discretion and expertise

---

*see also* AR 52872 (closing route V1003A), 52931 (closing route V1007A).

. . . as long as they are reasonable."); *Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1301 (9th Cir. 2003) ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own experts, even if a court may find contrary views more persuasive.") (citing *Marsh*, 490 U.S. at 378).

Plaintiffs also criticize BLM for relying on a phased approach to identifying historic properties. Again, this argument is misplaced. NHPA regulations provide that "[w]here the alternatives under consideration consist of corridors or large land areas, . . . the agency official may use a phased process to conduct identification and evaluation efforts." 36 C.F.R. § 800.4(b)(2). This regulation allows BLM to postpone the process of identifying sites until it chooses between the alternatives. *Id.* "The agency official may also defer final identification and evaluation of historic properties if it is specifically provided for in a memorandum of agreement." *Id.* BLM's route designations satisfy these criteria for phased identification. They involve a large land area, and BLM has entered into a national programmatic agreement with the ACHP and a specific protocol with the Arizona SHPO regarding § 106 compliance. AR 64106, AR 64118.

Section 800.4(b)(2) directs the agency to institute a process that would "establish the likely presence of historic properties within the area of potential effects . . . through background research, consultation and an appropriate level of field investigation" and to consider the views of the SHPO. This process is set forth in Instruction Memorandum 2007-030. *See* AR 42267–71. The Memorandum requires a Class I inventory of the area of potential effect, additional inventories where cultural resources are likely to be affected, and consultation with the SHPO. AR 42267-69. A comprehensive Class III inventory, entailing the identification of all historic sites, is not required for route designations that simply allow continued use of existing routes or close routes. Finally, the Memorandum states that a "Class II inventory, or development and field testing of a cultural resources probability model, followed by Class III inventory in high potential areas and for specific projects, may

be appropriate for larger planning areas for which limited information is currently available." AR 42268.

Contrary to Plaintiffs' assertions, BLM's approach was consistent with IM 2007-030. "Class II or III inventories are not necessary if the status quo remains, restricts use, travel has not concentrated, or the analysis is done at the planning level." *Montana Wilderness Association*, 2011 WL 3489699, at *11. This is the approach adopted by BLM with respect to the Monuments. Moreover, in addition to conducting a Class I inventory, BLM reviewed existing Class III inventory data, AR 62328, 62598, and recommended Class III inventories and deferred route designations in 10 "high potential areas." AR 62599.

The RMPs do not open any new routes or designate any non-route areas open to OHV use. AR 62327–28, 62598. BLM also considered whether closing routes or authorizing continued use on existing routes could have adverse effects on historic properties by concentrating travel on other routes, thus requiring more detailed surveys pursuant to IM 2007-030. AR 62327–28, 62598; *see* AR 42268. Finally, the RMPs do not approve any specific projects, and provide that any such projects proposed in the future will be subject to § 106 compliance. *See* AR 61020.

Plaintiffs further contend that a phased inventory approach is impermissible because the route designations were final with the issuance of the RMPs and no additional inventories will be carried out before vehicle use is permitted. Plaintiffs cite *New Mexico ex rel. Richardson v. BLM*, 459 F. Supp. 2d 1102, 1125 (D.N.M. 2006), *rev'd on other grounds*, 565 F.3d 683 (10th Cir. 2009), which held that under the NHPA "an agency must consider the impacts of a project . . . before any action is taken to make that specific project a reality." The district court in *Richardson* held that BLM, which had authorized a lease for oil and gas development on protected land, was required to complete the § 106 process before a lease was issued. *Id.* The present case is distinguishable. As previously noted, although BLM designated routes, the RMPs do not open any new routes in the Monuments but instead close

hundreds miles of routes to the public. *See* AR 62439, 62749–50. Thus, the approval of the route designations in the Monuments is distinct from situations in which agencies have approved development actions that would affect cultural resources.

In addition, BLM notes that the route designations are subject to change where there is the potential for harm to cultural resources. The Memorandum recognizes BLM's "continuing management responsibilities," and specifically provides that BLM will monitor motorized vehicle routes, and where potential effects are noted recommend mitigation to prevent harm to such resources. AR 42267, 42270. The RMPs also provide that routes causing resource damage are to be rerouted or reclaimed. AR 62440, 62750. Finally, BLM will continue to conduct inventories to meet its NHPA obligations. *See* AR 62328, 62599.

Under these circumstances, BLM has made a reasonable and good faith effort to inventory historic properties within the Monuments. Therefore, BLM's route designations do not violate the NHPA.

## E. The Wilderness Settlement

The Wilderness Settlement is an agreement entered into by the State of Utah and the Department of the Interior in 2003. *See* AR 64037. The Settlement terminated BLM's authority under FLPMA § 603 to designate Wilderness Study Areas. *Id.* It also provided, however, that "nothing herein shall be construed to diminish the Secretary's authority under FLPMA to . . . utilize the criteria in Section 202(c) to develop and revise land use plans, including giving priority to the designation and protection of areas of critical environmental concern." AR 64049.

The Ninth Circuit has explained that the FLPMA "interacts with the Wilderness Act to provide the BLM with broad authority to manage areas with wilderness characteristics contained in the federally owned land parcels the [BLM] oversees, including by recommending these areas for permanent congressional protection." *Oregon Natural Desert Ass'n v. Bureau of Land Management ("ONDA")*, 625 F.3d 1092, 1114–15 (9th Cir. 2010)

(noting that "Wilderness values are among the resources which BLM can manage"); *see also Utah v. Norton*, No. 2:96-CV-0870, 2006 WL 2711798, *23 (D. Utah Sept. 20, 2006) ("The Settlement allows for the BLM to exercise the full extent of its discretion under section 202's multiple-use and sustained-yield policy."), *aff'd on other grounds*, *Utah v. U.S. Dep't of the Interior*, 535 F.3d 1184 (10th Cir. 2008).

Plaintiffs raise an as-applied challenge to the Wilderness Settlement, arguing that BLM interpreted the s Settlement as prohibiting it from applying wilderness level protections in violation of NEPA and the FLPMA. BLM counters that notwithstanding the Wilderness Settlement it "may consider information on wilderness characteristics," such as solitude and opportunities for primitive and unconfined recreation, when preparing land use plans. AR 41969–70. Thus, BLM policy provides that "[l]ands with wilderness characteristics may be managed to protect and/or preserve some or all of those characteristics." AR 41969 ; *see, e.g.*, AR 36577.[10] Pursuant  this policy, the RMPs identify 140,949 acres in Parashant and 36,018 acres in Vermillion that would be protected to maintain wilderness characteristics. AR 61092; *see* AR 60486–89 (summarizing alternatives considered by BLM for the protection of lands with wilderness characteristics); AR 61075–94 (analyzing the potential impacts of the alternatives proposed on lands with wilderness characteristics).

These circumstances distinguish *ONDA*, where the court rejected BLM's argument that "wilderness characteristics have no independent vitality" under FLPMA. 625 F.3d at 1111. Instead, the RMPs manage the Monuments to protect wilderness characteristics "without requiring complete, permanent non-impairment of wilderness values. *Id.* at 1114. Therefore, Plaintiffs' as-applied challenge fails.

---

[10]    According to Plaintiffs, BLM has acknowledged that its "hands were tied" with respect to imposing wilderness level protections on lands in the Monuments. In the passages cited, BLM simply acknowledged that after the Wilderness Settlement it "must not manage areas . . . to maintain wilderness characteristics 'as if they are or may become congressionally designated wilderness areas.'" AR 36577. BLM explained, however, that "it may manage them using special protections to protect wilderness characteristics." *Id.*

# V. CONCLUSION

Plaintiffs have failed to carry their burden under the APA to show that the RMPs should be set aside as arbitrary and capricious. *See* 5 U.S.C. 706(2)(a).

Accordingly,

**IT IS ORDERED** that Plaintiffs' motion for summary judgment (Doc. 51) is **denied**.

**IT IS FURTHER ORDERED** that Defendants' motion for summary (Doc. 63) is **granted**.

**IT IS FURTHER ORDERED** that the Clerk of Court shall enter judgment accordingly.

Dated this 30th day of September, 2011.

Paul G. Rosenblatt
United States District Judge